**In re HECK'S, INC., Debtor in Possession.**

**Bankruptcy No. 87–20150.**

United States Bankruptcy Court,
S.D. West Virginia.

Feb. 21, 1990.

Thomas R. Goodwin, Richard E. Rowe, Susan C. Wittemeier, Suzanne Jett, Goodwin & Goodwin, Charleston, W.Va., for debtors.

John J. Nesius, Charleston, W.Va., Asst. U.S. Trustee, for D. of W.Va.

Robert M. Miller, Harvey S. Berenson, James M. Nolan, Arlene R. Koval, Mark A. Frankel, Berlack, Israels & Liberman, New York City, Frances W. McCoy, Charleston, W.Va., for Equity Sec. Holders' Committee.

Scott L. Hazan, Carrie G. Fishman, Otterbourg, Steindler, Houston & Rosen, New York City, William F. Dobbs, John Lawler, Michael Foster, Ellen S. Cappellanti, Jackson & Kelly, Charleston, W.Va., for Unsecured Trade Creditors' Committee.

David A. Murdoch, Sheila J. Tolgyesi, Kirkpatrick & Lockhart, Pittsburgh, Pa., P. Michael Pleska, Julia A. Chincheck, Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., for Bank Creditors' Committee.

## TABLE OF CONTENTS

Page

I. OVERVIEW OF THE CASE ............................................781
 A. Description of Parties in Interest ......................................781
 B. Professionals Employed by Parties in Interest ..........................781
 C. Plans of Reorganization ...............................................783
II. FACTORS CONSIDERED IN FINAL COMPENSATION ....................783
 A. Statutes ...............................................................783
 B. Administrative Orders .................................................784
 C. Other Factors Related to Final Compensation ...........................784
 1. Deferred Fees .....................................................784
 2. Outstanding Objections to Fees ....................................785
 3. Claims Treatment and Enterprise Value of the Debtor in Possession....785
III. OUTSTANDING FEE APPLICATIONS OF BERLACK, ISRAELS & LI-
 BERMAN .................................................................786
IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW ....................788
 A. Pending Objections of Bank Committee and Others .....................788
 1. Objection to Fees for Duplicative and Unnecessary Legal Services....788
 a. Objection to Fees for Intervention in Breach of Contract Action....788
 b. Objection to Fees for Analysis of Documents Produced by
 Sullivan & Cromwell Relating to Accounting Liability .........791
 c. Objection to Fees for Unnecessary Review and Summaries of
 Pleadings .................................................791
 d. Objection to Fees for Review of Net Operating Loss by Tax
 Partners ..................................................792
 e. Objection to Fees for Preferential Transfer and Fraudulent
 Conveyance Research .......................................792
 f. Objection to Fees for Preparation of Statements of Position ....792
 g. Objection to Fees for Analysis of Motion for Setoff............792
 2. Objection to Fees for Billing for Non-Legal Personnel ..............793
 3. Objection to Fees for Charges for 2004 Examination of Banks ......793
 4. Objection to Charges for Fee Application Preparation ..............793
 5. Objection to Fees for Pre-Disclosure Statement Hearing Litigation....793
 a. Proposed Compromise of Objections .............................794
 b. Objection to Fees for Notices, Objections, Motions, Requests
 and Interrogatories Served in 26–Day Period .................795
 c. Objection to Fees for Motion for Appointment of a Trustee ....796
 d. Objection to Fees for Putnam County Litigation ...............797
 i. Application to Compel Shareholders' Meeting ............ 798
 ii. Complaint Against Officers and Directors ............... 801
 e. Conclusion and Summary of Fees to be Denied by Virtue of
 Considerations a. through d. Above .........................803
 B. Representation of Laventhol & Horwath on Appeal .....................804
 C. Motion of Berlack, Israels & Liberman to Reconsider Order of August
 11, 1987 ..............................................................805
 1. Fees Denied for Costs for Gaining Employment by the Equity
 Committee ........................................................805
 2. Fees Denied for Travel ............................................805
 3. Fees Denied for Failure to Document Charges, Allocate Work and
 Control In–Office Conferences ....................................806
 4. Expense Reimbursements Denied ...................................806
 D. Findings with Respect to Rates of Compensation to be Allowed to
 Members of Berlack, Israels & Liberman ..............................806

RONALD G. PEARSON, Bankruptcy Judge.

This is the first of several decisions awarding final compensation to professionals employed in this case. Parts I and II of this Memorandum Opinion apply to all professionals, while Parts III and IV apply only to Berlack, Israels & Liberman, counsel for the Equity Security Holders' Committee in Heck's, Inc.

## PART I

### OVERVIEW OF THE CASE

**A. DESCRIPTION OF PARTIES IN INTEREST.**

On March 5, 1987, a Chapter 11 petition was filed by Heck's, Inc. [hereinafter also "DIP"], a public corporation [1] with several thousand shareholders operating a chain of over 100 discount department stores located in West Virginia, Kentucky, Ohio, Virginia and Tennessee. The schedules and statements filed by Heck's, Inc. reflect total assets of $182 million versus total liabilities of $115.5 million. Priority claims totaled $5.5 million, secured claims totaled $46.5 million, and general unsecured claims totaled $63.5 million. On the same date, Chapter 11 petitions were filed for three wholly owned subsidiary companies, Heck's Properties, Inc.; Heck's Properties II, Inc.; and Tauberg Company. [Hereinafter, Heck's, Inc. and above three subsidiary companies are also referred to collectively as "debtors."] The Court ordered that notices be sent jointly in the four cases and a joint Plan of Reorganization was eventually filed and confirmed on behalf of all four debtors. Another wholly owned subsidiary of Heck's, Inc., Maloney Enterprises, Inc. [hereinafter Maloney's], subsequently filed a Chapter 11 proceeding on March 1, 1988, and was authorized to obtain post-petition secured credit from the DIP. Maloney's was administered separately and a separate plan of reorganization was confirmed, under the terms of which Maloney's was merged into the DIP.

The Court appointed three committees to represent creditors in the case of Heck's Inc.: (1) the Unsecured Trade Creditors' Committee [hereinafter "Trade Committee"]; (2) the Bank Creditors' Committee [2] [hereinafter "Bank Committee"]; and (3) the Equity Security Holders' Committee [hereinafter "Equity Committee"]. Committees were appointed only in the case of Heck's, Inc., as the claims against the three subsidiary companies were primarily mortgage claims and no creditors' committees formed.

**B. PROFESSIONALS EMPLOYED BY PARTIES IN INTEREST.**

Listed below are the professionals employed by the debtors and each committee appointed in the case of Heck's, Inc.:

Professionals Employed by Heck's, Inc. and the Three Related Debtors

| | |
|---|---|
| Goodwin & Goodwin | Bankruptcy Counsel |
| Touche Ross & Company (New York, NY office) | Management and Accounting Consultant |
| Touche Ross & Company (Pittsburgh, PA office) | Audit and Tax Consultant |
| Keen Realty Consultants, Inc. | Real Estate Consultant |
| McCabe–Henley Properties, Inc. | Real Estate Consultant |
| Spalding/Emig Company | Real Estate Appraiser |
| PBR Financial Services | Inventory Valuation Expert |

1. Listed on the New York Stock Exchange.

2. Upon the joint motion of twelve banks, the Bank Committee was appointed to represent the unsecured interests of numerous bank creditors holding partially secured claims against the DIP. Professionals employed by the Bank Committee were authorized to bill the DIP only for work relating to the unsecured claims of the banks. Pursuant to further order, the Court received and inspected *in camera* the charges the Bank Committee billed the banks for secured claims representation.

The four related debtors also requested authority to employ an investment banker, Bear Stearns & Co., which employment was opposed by the Equity Committee and denied by the Court.

#### Professionals Employed Only by Heck's, Inc.

| | |
|---|---|
| Reavis & McGrath (now Fulbright, Jaworski & Reavis McGrath) | Special Securities Counsel |
| Holroyd & Yost (now Holroyd, Yost & Merical) | Special Labor Counsel |
| Shaffer & Shaffer | Special Workers' Compensation Counsel |
| Robert Ronnenberg | Consultant in Litigation with Algemene Bank Nederland |

---

In addition, the officers and directors of Heck's, Inc. employed the law firm of Myerson & Kuhn to represent them in litigation filed against them by the Equity Committee and other shareholders in the Circuit Court of Putnam County, West Virginia. By Order of March 29, 1989, the DIP was authorized to reimburse its officers and directors for $91,582.25 expended for such representation, pursuant to the indemnification provisions of the DIP's corporate By–Laws, in partial satisfaction of the DIP's motion for such authority.

#### Professionals Employed by the Trade Committee in Heck's, Inc.

| | |
|---|---|
| Jackson, Kelly, Holt & O'Farrell (now Jackson & Kelly) | Local Counsel |
| Otterbourg, Steindler, Houston & Rosen | New York Counsel |
| Price Waterhouse* | Accountant |
| Buxbaum, Ginsberg & Associates, Inc. | Retail Consultant |

* The firm of Price Waterhouse was employed to perform accounting services for the Trade Committee, which employment was later amended to authorize the firm to perform similar services for the Equity Committee, absent a conflict.

#### Professionals Employed by the Bank Committee in Heck's, Inc.

| | |
|---|---|
| Bowles, McDavid, Graff & Love (now Bowles, Rice, McDavid, Graff & Love) | Local Counsel |
| Kirkpatrick & Lockhart | Pennsylvania Counsel |
| Ernst & Whinney | Accountant |

#### Professionals Employed by the Equity Security Holders' Committee in Heck's, Inc.

| | |
|---|---|
| Frances W. McCoy (withdrew November 6, 1987) | Local Counsel |
| Berlack, Israels & Liberman | New York Counsel |
| Laventhol & Horwath* | Accountant |

* Upon the filing of the debtors' first Disclosure Statement and Plan in August of 1988, the Equity Committee applied on August 31, 1988 to employ the firm of Laventhol & Horwath to provide accounting services separate from those provided the Trade Committee by the firm of Price Waterhouse. The application was approved without hearing on September 12, 1988.

## C. PLANS OF REORGANIZATION.

The four related debtors filed the first joint Plan of Reorganization on August 1, 1988, and the supporting Disclosure Statement was filed August 19, 1988. At the hearing on the first Disclosure Statement held October 12 and 13, 1988, the debtors were directed to make certain amendments to the Disclosure Statement as a condition to Court approval. On March 3, 1989, the four debtors filed the First Amended Disclosure Statement and Plan. The First Amended Disclosure Statement and Plan was not ruled upon by the Court due to the filing of the debtors' Second Amended Disclosure Statement and Plan on March 24, 1989, which superceded the documents filed March 3, 1989. On March 24, 1989, an Order was entered granting the debtors' motion for approval of the Second Amended Disclosure Statement without further hearing and setting hearing on confirmation of the Second Amended Plan. The debtors' Second Amended Plan was confirmed by Order entered May 31, 1989, and the debtors achieved consummation of the Second Amended Plan on September 28, 1989, as reflected in the notice filed with the Clerk that day.

## PART II

## FACTORS CONSIDERED IN FINAL COMPENSATION

### A. STATUTES.

As required by 11 U.S.C. §§ 327 and 1107, all professionals seeking compensation from the Chapter 11 debtors' estates were employed with Court approval. Each creditors' committee was represented by attorneys and accountants [3], as authorized by 11 U.S.C. § 1103. Such professionals were authorized by the Court to assist each committee in the exercise of powers and discharge of duties set forth in 11 U.S.C. § 1103(c):

A committee appointed under section 1102 of this title may—

1. consult with the trustee or debtor in possession concerning the administration of the case;

2. investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

3. participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

4. request the appointment of a trustee or examiner under section 1104 of this title; and

5. perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c).

The Bankruptcy Code requires that professionals apply for Court approval of their compensation. Section 330(a) provides that a professional person employed under § 1103 may be awarded *"reasonable* compensation for actual, *necessary* services rendered ... and reimbursement for actual, necessary expenses." (Emphasis added.) Section 330(a)(1) specifically states that professionals are entitled to

reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services,

---

**3.** As noted in Part I of this Opinion, the Equity and Trade Committees shared the same ac-countant until September 12, 1988.

and the cost of comparable services other than in a case under this title; ....

11 U.S.C. § 330(a)(1).

■ Section 330 of the Bankruptcy Code requires a two-part inquiry by the Court: (a) whether the service for which compensation is sought was actually performed and *necessary*; and (b) whether the *compensation request, in light of the nature, extent and value of such services, is reasonable. See In re Liberal Market, Inc.*, 24 B.R. 653 (Bankr.S.D.Ohio 1982). If the services rendered satisfy the first criteria, this Court has adopted several factors to evaluate the reasonableness of the compensation requested, including: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the professional's opportunity costs due to involvement in the case; (5) the customary fee for like work in this and other courts; (6) the professional's expectations at the outset; (7) the time limitations imposed by the circumstances; (8) the amount in controversy and the results obtained; (9) the experience and ability of the professional; and (10) professional fee awards in similar cases. *See Harman v. Levin*, 772 F.2d 1150 (4th Cir.1985); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir.1978).

## B. ADMINISTRATIVE ORDERS.

The Court attempted, by entry of administrative orders, to set out uniform procedures by which the professionals employed by the four related debtors and the Committees could request compensation for work performed and for reimbursement of expenses and to establish guidelines for the allowance of same. The administrative orders pertaining to fee and expense reimbursement are designated as Administrative Order III, the first of which was entered March 12, 1987. This Order was amended on April 28, 1987, and again amended by addendum made June 10, 1987. A third amended Administrative Order III

was entered on September 24, 1987, effective as of September 10, 1987. Among other things, Administrative Order III required supervising attorneys and managing professionals to strictly adhere to the provisions of 11 U.S.C. § 330 in the allocation of work to ensure that reliable results were obtained in the most economical fashion possible. Professionals were also required to itemize the time for which payment was sought, with sufficient description of the work to permit reviewing parties to make an intelligent judgment as to the necessity of that work and the reasonableness of the compensation sought. Administrative Order III as amended also required the DIP to designate a Fee Application Auditor to review each fee application for compliance with the procedures and standards established in this case.

Later, Administrative Order IV, entered June 24, 1988, expanded the duties of the Fee Application Auditor and directed the filing of his work product and monthly summary reports to ensure their availability to parties in interest.

Administrative Order V was issued August 5, 1988 to establish the procedure by which notice was given to parties in interest of the Fee Application Auditor's monthly summary report. The monthly summary reports classified the professionals' work for which compensation was requested during that month. Professionals were given an opportunity to review the summary report and the Fee Application Auditor's work product and to file objection thereto.

## C. OTHER FACTORS RELATED TO FINAL COMPENSATION.

1. *Deferred Fees.* The Court reserved substantial fees for final ruling in this case, knowing that some objections of parties in interest were not likely to be raised until the end of the case and because the Court wanted to provide an incentive for all to work for the best result achievable under the Code. Fees have been approved on an interim basis to ensure that professionals were not forced to carry the costs of necessary representation without reimbursement. Because of concerns ex-

pressed on the record, the Bank and Equity Committee counsel have had a greater percentage of fees deferred than have other counsel. Accounting firms have also had a significant portion of their fees deferred due to the Court's concern that the hourly rates of compensation requested may be excessive, with the exception of the Pittsburgh office of Touche Ross & Company, which performed necessary audit services for Heck's, Inc. and which certified financial statements.

2. *Outstanding Objections to Fees.* Various objections were raised to compensation requested during the course of this case, some of which were taken under advisement by the Court. Anyone with knowledge of the difficulties encountered by a debtor attempting reorganization understands the reluctance of a debtor and other parties in a bankruptcy case to raise objection to the compensation requested by professionals. Compromise is important in a reorganization proceeding, and litigating fees makes it more difficult to obtain parties' agreement on other issues. Partly in recognition of this problem, Congress established the U.S. Trustee System nationwide and granted the U.S. Trustee party-in-interest standing to provide a means for a more objective review of fees of professionals in reorganization cases.[4] The U.S. Trustee system was implemented in West Virginia in August of 1988, approximately 18 months after the filing of this case. Once established, that office raised reasonable and timely objections to various professional fees and has been the only party to consistently raise these objections.

3. *Claims Treatment and Enterprise Value of the Debtor in Possession.* As previously stated, the two most significant classes of pre-petition creditors and the one class of interest holders had attorneys and accountants available to them throughout the case. These professionals were hired to ensure that the various classes of pre-petition creditors and interest holders had help in assessing the plans and operating results of the DIP, who would be proposing treatment of claims by class while attempting to reorganize.

In order to make decisions about the necessity or reasonableness of that professional work, one must understand the treatment various classes of pre-petition claims were to receive under the debtors' plans of reorganization, as first proposed and later as confirmed, and how that treatment relates to the financial condition of the DIP and its going concern or enterprise value.

In evaluating the reasonableness of conclusions reached by professionals employed in this case as to the enterprise value of the DIP and the DIP's capability to pay pre-petition claims, the Court has reviewed the initial Plan proposed and the audited financial reports filed with the Securities and Exchange Commission and with the Court as supporting documents to the Disclosure Statement filed by the debtors. Article XIII, Paragraph F., *Estimated Recoveries Under the Plan* from the debtors' original Disclosure Statement filed August 19, 1988, is attached as Exhibit A and indicates the proposed payout under this original Plan. The consolidated balance sheet filed with this Plan reflects a growing deficit in stockholders' equity and quantifies the losses incurred by the business up to that point of the case. At filing, the DIP reported a stockholders' equity of about $60 million. The consolidated balance sheet from Heck's Form 10–Q filing included with the Disclosure Statement filed August 19, 1988 depicts a negative stockholders' equity in excess of $6.7 million as of May 28, 1988. This decline was reported in part by the monthly reports filed by the DIP which were circulated to all Committees as the case progressed. The Liabilities and Stockholders Equity (Deficiency in Assets) statement in the Condensed Consolidated Balance Sheet from the Securities and Exchange Commission Form 10–Q, submitted as an exhibit to the Disclosure Statement filed August 19, 1988, is attached as Exhibit C.

---

4. 28 U.S.C. § 586; 1986 U.S.Code, Cong. and Admin.News, 5227. *See also* Bankruptcy Rules

X–1008(a)(3) and X–1009(a).

The consolidated balance sheet included as an exhibit to the Second Amended Disclosure Statement reflects that the deficit in stockholders' equity had grown to $45 million by December 31, 1988.[5] Article XIII, Paragraph E., *Estimated Recoveries Under the Plan* from the debtors' Second Amended Disclosure Statement filed March 24, 1989,[6] is attached as Exhibit B. This Exhibit indicates the likely distribution to creditors under the confirmed Plan.

As exhibits from the Disclosure Statements demonstrate, at no time was full payment for pre-petition unsecured creditors contemplated by officers and professionals employed by the debtors. Further, with the publication of the Form 10–Q for May 28, 1988, the stockholders' equity turned negative. In the original Plan filed in August of 1988, unsecured creditors were to be paid a total of 61.6 cents on the dollar of claim (26.5 cents in cash, 22 cents in debentures and 13.1 cents in common stock per dollar of claim).[7] Equity security holders were to receive, including warrants, about 10% of the new common stock to be issued by the DIP. The DIP valued the new common stock at $14 million.[8] In the Second Amended Plan, the total payout to unsecured creditors was reduced to 37.4 cents on the dollar. All proposed debentures were eliminated.[9] Of the 37.4 cents per dollar to be paid unsecured creditors, 22.3 cents would be in cash and 15.1 cents in new common stock.[10] Equity security holders were now to receive (in exchange for all old shares cancelled under the plan) 200,000 shares of the new stock issue which totaled 2,222,222 shares. The DIP valued the stock in the Second Amended Plan at $15 million [10] making the 1,800,000 shares to be distributed to unsecured creditors worth about $12.15 million by the debtors' estimate.

On May 31, 1989, the Second Amended Plan was confirmed after it was determined that the impaired class of unsecured creditors voted in favor of confirmation. That Plan was also accepted by voting members of the class of equity security holders whose ownership interests were diluted 90% by the Plan.

The Second Amended Plan of Reorganization provided for the establishment of an escrow account for the payment of professional fees found to be entitled to administrative claim status. This account was funded from the cash pool established under the Second Amended Plan and from the DIP's operating funds.[11] Any funds remaining in such escrow account after the payment of all allowed professional fees, together with interest earned thereon, are to be returned to the cash pool for distribution in accordance with the Plan.

## PART III

## OUTSTANDING FEE APPLICATIONS OF BERLACK, ISRAELS & LIBERMAN

In determining final compensation for BIL, counsel for the Equity Committee, the Court has considered all applications filed by Berlack, Israels & Liberman [hereinafter "BIL"], some of which have not yet been ruled on and others which have been partially ruled on by prior Orders with portions of the compensation deferred for later consideration. The Court also considered all outstanding objections to BIL compensation requests, including a proposed compromise of fees for the period June, 1988 through October, 1988 taken under advisement.

---

5. Exhibit 1 to the Second Amended Disclosure Statement filed March 21, 1989.

6. For purposes of this Order, only the Plan and Disclosure Statement filed in August of 1988 and the confirmed Second Amended Plan and Disclosure Statement are discussed. *See also* Part I., C. of this Opinion.

7. Exhibit A of this Opinion.

8. Exhibit A of this Opinion.

9. Debtors' Second Amended Disclosure Statement, Article VIII, Class 7, filed March 14, 1988.

10. Exhibit B of this Opinion.

11. *See* explanation of Class 1, Article VIII of debtors' Second Amended Disclosure Statement, filed March 21, 1989.

The most extensive pending objection to compensation requested by BIL was filed by the Bank Committee and encompasses work for nearly the entire time BIL has served as counsel for the Equity Security Holders' Committee in this case. In addition, a motion of BIL for reconsideration of this Court's Order of August 11, 1987 was considered, as well as fees of $10,383.00 remanded to this Court for consideration by order of the United States District Court for the Southern District of West Virginia. The issues raised in each pending matter are discussed in detail in Part IV of this Opinion. A summary of all fee applications filed by BIL and the monetary amounts pending decision are presented in the following chart.

### FEE APPLICATIONS OF BERLACK, ISRAELS & LIBERMAN

| Time Period | Fees | Expenses |
| --- | --- | --- |
| March 25, 1987 to May 31, 1987 | $ 78,263.50 | $ 7,511.23 |
| June 1, 1987 to June 30, 1987 | 79,662.00 | 11,836.21 |
| July 1, 1987 to July 31, 1987 | 36,895.00 | 7,373.37 |
| August 1, 1987 to Sept. 30, 1987 | 61,965.30 | 11,706.16 |
| Oct. 1, 1987 to Oct. 31, 1987 | 27,995.00 | 8,785.55 |
| Nov. 1, 1987 to Dec. 31, 1987 | 14,955.80 | 3,953.62 |
| Jan. 1, 1988 to Jan. 31, 1988 | 8,636.30 | 2,071.30 |
| Feb. 1, 1988 to Feb. 29, 1988 | 15,398.90 | 3,223.54 |
| March 1, 1988 to April 30, 1988 | 46,508.70 | 5,434.55 |
| May 1, 1988 to May 31, 1988 | 23,195.70 | 2,987.32 |
| June 1, 1988 to July 31, 1988 [12] | 74,709.50 [13] | 5,272.94 [13] |
| Aug. 1, 1988 to Sept. 30, 1988 [12] | 97,366.40 [13] | 9,723.20 [13] |
| Oct. 1, 1988 to Oct. 31, 1988 [12] | 71,583.70 [13] | 11,425.67 [13] |
| Nov. 1, 1988 to Dec. 31, 1988 | 33,039.20 | 8,966.18 |
| Jan. 1, 1989 to Feb. 28, 1989 | 32,660.10 | 5,921.20 |
| March 1, 1987 to April 30, 1987 | 15,719.30 | 5,091.15 |
| May 1, 1989 to May 31, 1989 | 6,923.70 | 978.48 |
| June 1, 1989 to June 30, 1989 | 2,120.60 | 979.93 |
| July 1, 1989 to July 31, 1989 | 2,586.20 | 996.13 |
| August 1, 1989 to August 31, 1989 | 3,055.40 | 666.10 |
| Sept. 1, 1989 to Sept. 30, 1989 | 3,846.90 [13] | 449.39 [13] |
| TOTAL REQUESTED | $737,087.20 | $115,353.22 |
| TOTAL DENIED | ($ 70,878.35) | ($ 8,383.48) |
| TOTAL ALLOWED | ($276,955.51) | ($ 75,348.27) |
| PENDING DECISION [13] | $389,253.34 | $ 31,621.47 |
| REMANDED BY DISTRICT COURT [14] | $ 10,383.00 | .00 |

12. Reflected here are the original amounts for which BIL applied for services rendered during the period of June 1, 1988 through July 31, 1988, for the period of August 1, 1988 through September 30, 1988, and for the period of October 1, 1988 through October 30, 1988. In a proposed compromise of various objections to its requested compensation, BIL voluntarily reduced the $243,659.60 in total fees requested in such applications by twenty percent (20%) to a total of $194,927.68. The Court took under advisement the approval of the proposed compromise by Order entered December 23, 1988.

13. These amounts include $141,746.84 in fees and $4,750.27 in expenses deferred in previous Orders and $247,506.50 in fees and $26,871.20 in expenses for the periods of June 1, 1988 to July 31, 1988, August 1, 1988 to September 30, 1988, October 1, 1988 to October 31, 1988, and September 1, 1989 to September 30, 1989, which have not been considered in previous Orders.

14. This $10,383.00 in outstanding fees of BIL was for work in connection with a motion of the Equity Committee to intervene in litigation initiated by the Debtor against Algemene Bank Nederland. Upon appeal by BIL to the United States District Court for the Southern District of West Virginia, this Court's denial of such fees was vacated and the matter remanded to the Bankruptcy Court, with direction that such compensation be considered in light of the District Court's final ruling on a motion to intervene filed by the Equity Committee.

| Time Period | Fees | Expenses |
|---|---|---|
| SUBJECT TO MOTION OF BIL TO RECONSIDER ORDER OF 8–11–87 [15] | $ 27,780.00 | $ 1,500.00 |
| TOTAL UNDER CONSIDERATION | $427,416.34 | $ 33,121.47 |

## PART IV

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. PENDING OBJECTIONS OF BANK COMMITTEE AND OTHERS.

The Bank Creditors' Committee filed, on October 6, 1989, a 1,082–page objection [16] to compensation requested by BIL, based on fees charged for the five categories of work set forth in the chart that follows.[17] The Court, in its review of exhibits attached to the Bank Committee's objection, reached different totals for the various categories of the objection, as is shown by the second column in the chart.

### SUMMARY OF EQUITY COUNSEL FEES OBJECTED TO BY BANK COMMITTEE

| | Fees Objected to as Summarized in Bank Committee Objection | As Derived by Court from Exhibit B to Bank Committee's Objection to BIL Fee Requests |
|---|---|---|
| 1. Duplicative and Unnecessary Legal Services | $109,131 | $114,189 |
| 2. Administration of Non–Legal Personnel | 19,101 | 23,340 |
| 3. 2004 Examination of Bank Group | 10,334 | 9,087 |
| 4. Fee Application Preparation and Review | 33,039 | 37,324 |
| 5. Pre–Disclosure Statement Hearing Litigation | 84,577 | 109,634 |
| TOTAL | $256,182 | $293,575 |

1. *Objection to Fees for Duplicative and Unnecessary Legal Services.* The Bank Committee's objection alleges that much of the compensation billed by BIL is for legal services which were duplicative and unnecessary. The various objections raised by the Bank Committee and the responses of BIL to such allegations are considered below in paragraphs a. through g.

■ a. *Objection to Fees for Intervention in Breach of Contract Action.* On August 7, 1987, BIL filed a motion on behalf of the Equity Committee to intervene in litigation the DIP was prosecuting in the United States District Court for the Southern District of West Virginia against the Algemene Bank Nederland, N.V. [hereinafter "ABN"]. The motion of the Equity Committee asserted an unconditional right to intervene under Rule 24(a)(1) and alternatively requested permission to intervene under Rule 24(b)(2) of the Federal Rules of

15. $27,780.00 in fees and $1,500.00 in expenses were denied by the Court in an Order entered August 11, 1987. BIL filed a motion to reconsider those amounts denied, which was taken under advisement.

16. The objection includes an exhibit consisting of excerpts from fee applications filed by BIL indicating the Bank Committee's objections to specific time charges of BIL.

17. Some of the objections raised by the Bank Committee were also raised in earlier objections filed by the Trade Committee and the U.S. Trustee.

Civil Procedure.[18] This intervention was attempted by the Equity Committee without leave of the Bankruptcy Court to permit expansion of counsel's appointment in this case, without notice to creditors of the proposed intervention, and without the capacity as a committee appointed under 11 U.S.C. § 1102 to assert a cause of action belonging to a debtor in possession who was already represented by counsel.[19] As the Bank Committee points out in its memorandum in support of its objection to these fees, the motion to intervene was accompanied by a complaint seeking damages for the Equity Committee against ABN. This pleading[20] was signed by Robert M. Miller, a partner of BIL whose fees were billed at $200.00 per hour in this case and whose resume reflects he had eleven years of experience at the time the pleading was filed. Although BIL obtained an unexplained stipulation by counsel for the DIP permitting the Equity Committee's intervention, by order entered October 15, 1988 the District Court vacated that stipulation entered a week earlier. The Equity Committee's motion to intervene was later rendered moot by the October 4, 1989 order of the District Court dismissing the action pursuant to agreement by the parties. The DIP was asked to pay for numerous hours of time Equity Committee counsel spent in misguided and unnecessary intervention effort. In August and September, 1987, BIL billed $10,383.00[21]; in October, 1987, $2,300.00; and in November, 1987, $1,500.00 for services relating to the ABN litigation. This Court denied each of the above fee requests because the DIP's interests were represented by counsel for the DIP and the work of the Equity Committee was duplicative of that of counsel for the DIP. Although the Equity Committee appealed the denial of the $10,383.00, no appeal was filed of the later denial of fees related to this issue.[22] The matter is now revisited because of the remand of the District Court and the recent objection of the Bank Committee to compensation for that work.

■ Rule 24(a) provides intervention of right in an action:

(1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a).

A reading of §§ 1103 and 1109 reveals no unconditional statutory right for the Equity Committee to intervene in the ABN litigation, nor does any other provision of law provide such a right. The pursuit of the corporation's interests by the DIP precluded intervention as a matter of right under Rule 24(a)(2) because the stockholders' interests were being adequately represented.[23]

---

**18.** Motion for Leave to Intervene filed with the U.S. District Court August 7, 1987.

**19.** Had application been made here for authority to assist counsel for the DIP as an intervenor, or in some other capacity represent the interests of the DIP, it would have given parties in the case a chance to consider augmenting the legal team assigned to the case by counsel for the DIP.

**20.** *See* Exhibit B to Objection of Bank Committee filed October 6, 1989.

**21.** By order of the District Court dated June 8, 1988, the amount of $10,383.00 was remanded to this Court for reconsideration pending ruling by the District Court on the motion to intervene.

**22.** This Court's Orders of January 21, 1988 and March 23, 1988 denied fees requested for such services in the amounts of $2,300.00 and $1,500.00, respectively. No appeals were filed to such Orders. *See* Court Docket Card, Case No. 87–20150.

**23.** The DIP filed a complaint July 10, 1987 in U.S. District Court for the Southern District of West Virginia, claiming compensatory and punitive damages resulting from ABN's alleged breach of contract, breach of good faith, tortious interference of business and abuse of process. Three days later, the DIP filed and served

Section 1103(c) of the Bankruptcy Code, which outlines powers and duties of committees, is derived from former Chapter XI, Rule 11–29(a) of the Bankruptcy Act. 5 COLLIER ON BANKRUPTCY, 15th ed. (MB), ¶ 1103.07[1]. Rule 11–29(a) provided:

(a) *Functions.* The committee selected pursuant to Rule 11–27 may consult with the trustee, receiver, or debtor in possession in connection with the administration of the estate, examine into the conduct of the debtor's affairs and the causes of his insolvency or inability to pay his debts as they mature, consider whether the proposed plan is for the best interests of creditors and is feasible, negotiate with the debtor concerning the terms of the proposed plan, advise the creditors of its recommendations with respect to the proposed plan, report to the creditors concerning the progress of the case, collect and file with the court acceptances of the proposed plan, and perform such other services as may be in the interest of creditors.

Bankruptcy Rule 11–29(a) (1976).

The history of § 1103(c) of the Code reveals that the appropriate activities of an equity committee were contemplated by Congress to be investigation and consultation relating to the administration of an estate and negotiations and recommendations concerning a proposed plan.

Section 1109(b) of the Code states "a party in interest, including ... an equity security holders' committee ... may raise and may appear and be heard on any issue *in a case under this chapter.*" (Emphasis added.) While courts disagree on the question of whether § 1109(b) gives standing to a creditors' committee to initiate an adversary proceeding under Bankruptcy Rule 7001,[24] where standing is granted by the Court, it is generally conditioned on the committee's bringing the suit on behalf of the debtor when the debtor is not adequately pursuing the cause of action.[25] In the present case, the DIP was diligently prosecuting the corporation's claim for damages for pre-petition wrongs and no order of this Court authorized this attempted intervention.

■ Rule 24(b)(2) of the Federal Rules of Civil Procedure, discussing permissive intervention, not intervention of right, states that one may be permitted to intervene in an action "when an applicant's claim or defense and the main action have a question of law or fact in common." Here, the complaint filed on behalf of the Equity Committee, attached by BIL to the motion to intervene, states no claim at all![26] Because the injury complained of was to the corporation, the cause of action, if one existed, was the DIP's to pursue for benefit of creditors and shareholders.

Numerous courts have held that a stockholder suing in an individual capacity lacks standing to assert claims against third parties for wrongs done to the business and property interests of the corporation. *Semida v. Rice*, 863 F.2d 1156 (4th Cir.

---

on the defendant Bank a first request for production of documents.

**24.** *In re Amarex, Inc.,* 36 B.R. 59 (Bankr.W.D. Okl.1984) (unsecured noteholders' committee lacks standing to prosecute a preference avoidance complaint)

**25.** *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988); *In re STN Enterprises,* 779 F.2d 901 (2d Cir.1985), *on remand* 73 B.R. 470 (Bankr.D.Vt.1987), *reversed on other issue* 99 B.R. 218 (D.Vt.1989); *Matter of Jermoo's, Inc.,* 38 B.R. 197 (Bankr.W.D.Wis. 1984) (that case was not brought in the name of the debtor could be corrected under Fed.R. Civ.P. 17 incorporated by Bankruptcy Rule 7017, and answer of debtor in possession suggests ratification of complaint); *In re Chemical Separations Corp.,* 32 B.R. 816 (Bankr.E.D.Tenn. 1983); *In re Toledo Equip. Co., Inc.,* 35 B.R. 315

(Bankr.N.D.Ohio 1983); *Matter of Joyanna Holitogs, Inc.,* 21 B.R. 323 (Bankr.S.D.N.Y.1982).

**26.** The complaint filed by BIL on behalf of the Equity Committee relates in paragraph 1 that Heck's, Inc. filed a complaint against ABN. In paragraph 2, the Equity Committee's complaint relates that Heck's, Inc. filed a Chapter 11 petition on March 5, 1987. Paragraph 3 of the complaint states: "Plaintiff–Intervenor, the Equity Committee, was appointed, pursuant to Section 1102(c)(2) of the Bankruptcy Code, as an official committee in Heck's Chapter 11 case to represent the interests of the many thousands of Heck's public shareholders." Paragraph 4 of the complaint incorporates (by reference) all allegations made in the complaint filed by Heck's, Inc. in the case. The remainder of the Equity Committee's complaint is a prayer for damages.

1988) (interpreting Virginia law); *Abella v. Universal Leaf Tobacco, Inc.*, 495 F.Supp. 713 (E.D.Va.1980); *Keepe v. Shell Oil Co.*, 260 S.E.2d 722, 220 Va. 587 (1979); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F.Supp. 858 (E.D.Va.1980).

Because the Equity Committee had no independent cause of action and because BIL was given no authority to support the work of counsel for the DIP or to represent the DIP [27], the intervention, where the DIP was diligently pursuing its own interests, was unnecessary.

The Equity Committee did have the right to monitor the work of counsel for the DIP, ask questions of them to satisfy that the proper actions were being taken, and otherwise test the DIP effort. BIL has previously been allowed fees of about $3,000.00 for work on the ABN litigation, approximately the same amount other firms billed for monitoring the DIP's effort. The requested compensation for work on ABN litigation of $10,383.00 is denied upon reconsideration, and the previous uncontested denials of $3,800.00 stand.

■ **b.** *Objection to Fees for Analysis of Documents Produced by Sullivan & Cromwell Relating to Accounting Liability.* The U.S. Trustee objects to, as unnecessary, the charges of BIL for drafting a confidentiality agreement regarding inspection of documents of the former accountant for the DIP, Peat Marwick Main & Co. The Bank Committee also objects to the same service, pointing out that James Nolan spent 8.9 hours at $155.00 per hour and Mark Frankel spent 68.6 hours at $155.00 per hour reviewing documents produced by Sullivan & Cromwell relating to a 1985 accounting error by the DIP. Of the total $12,012.50 charged for this work, 26.3 hours equaling $4,076.50 were spent just for preparation of a memorandum, a work product no one outside of BIL ever saw, nor did BIL ever demonstrate any benefit whatsoever to the estate from this exercise in research and writing.[28]

BIL responds that since this Court authorized the review of the above records, the work was necessary and the estate should pay. The Court permitted inspection of the records, but believes the amount of time spent on the review is out of line with reason and that it was a job better suited to the accountants available to the Equity Committee than to its lawyers. Neither the fee application of BIL nor its response to the Bank Committee's objection demonstrates the necessity of this work. The Court sustains the objection in part and finds all of the work unnecessary with the exception of 15 hours at $150.00 per hour, or $2,250.00. The Court denies the remainder of the $12,012.50 charged in connection with this activity, or $9,762.50.

■ **c.** *Objection to Fees for Unnecessary Review and Summaries of Pleadings.* Associates at BIL read and prepared daily summaries of virtually every document filed in this case. While the Court expects counsel to be conscientious and diligent in its review of matters pending in the case, a written summary of every document is beyond the scope of diligence. Having a summary available for review rather than the complete document may have saved the managing partner time; however, some discretion should have been exercised over the extent to which summarization of the pleadings was utilized. A review of the BIL fee applications, the objection of the Bank Committee, and the response of BIL to this objection, upon which the greatest reliance was placed, fails to show that all of these summaries could have been necessary. Associates at BIL requested a total of $30,696.00 to review and summarize pleadings and, reducing the charge for this service to a reasonable level, the Court denies $20,000.00 as unnecessary work.

---

**27.** *See* provisions of 11 U.S.C. § 1103(c) as shown in Part II.,A. of this Opinion. This Code section lists the powers and duties of a committee appointed to represent interests in a bankruptcy case.

**28.** The Bank Committee claimed in its memorandum of law in support of its objection that 75.2 hours were devoted to work on the Sullivan & Cromwell documents by Mr. Frankel. The Court's review of the applications found the time itemized to be closer to 68.6 hours.

■ d. *Objection to Fees for Review of Net Operating Loss by Tax Partners.* The Bank Committee objects to charges for one of BIL's partners, Harvey Berenson, to review net operating loss material. This review was conducted during the months of November and December, 1988, and January 1989. Mr. Steven Whitmore, an associate with BIL, also conducted a review of the same material and attended meetings with the DIP and other counsel to obtain changes in the Plan. BIL's response to this objection fails to explain why this work was necessary in the representation of equity interests, considering the poor post-petition earning performance of the DIP. The Court sustains the objection of the Bank Committee to a partner, Mr. Berenson, performing this review when Mr. Whitmore was apparently capable of doing so. The Court, finding the fees charged for Harvey Berenson in the amount of $4,140.00 for the period of November 27, 1988 through January 31, 1989 to be duplicative and unnecessary, denies such compensation.

■ e. *Objection to Fees for Preferential Transfer and Fraudulent Conveyance Research.* The Court also agrees with and sustains a major part of the Bank Committee's objection with respect to April and May, 1988 billings of BIL for preferential transfer and fraudulent conveyance research. It is recognized that § 1109(b) of the Bankruptcy Code may give standing to a committee to initiate or intervene in an adversary proceeding where the debtor or debtor in possession unjustifiably fails to bring an action or does not adequately represent the estate.[29] However, there is no implied right to do so where there is no evidence that the debtor has unjustifiably failed to bring an action or is abusing its discretion in representing the estate.[30] It

was the duty of counsel for the DIP to do this research and it appears that they did so, because a Plan filed in August, 1988 compromised a preference claim against the Bank Committee. Some of the $5,125.00 BIL charged for this work appears to have been duplicative and BIL provides no response to the Bank Committee objection that causes this Court to conclude otherwise. Specifically, 10.3 hours of work performed by Arlene Koval in May of 1988 duplicates other services, and the $1,339.00 in compensation requested for such work is denied.

■ f. *Objection to Fees for Preparation of Statements of Position.* The Bank Committee objects to the compensation requested by BIL for preparation of written statements of the position of the Equity Committee on various matters which did not significantly affect the interests of equity security holders. The Court sustains the objection for those months where BIL also attended hearings and verbally announced the position of the Equity Committee. BIL billed a total of $4,379.89 for such work, which is denied as duplicative of BIL's oral presentations at hearings and unnecessary.

■ g. *Objection to Fees for Analysis of Motion for Setoff.* As was noted on page 13 of this Court's October 19, 1987 Memorandum Order denying permanent employment of BIL as lead counsel for the Equity Committee, fees charged by BIL were out of line in comparison with fees of other firms for legal analysis of a motion of Pittsburgh National Bank for setoff. The brief prepared for the Equity Committee was filed late and was much less comprehensive than one filed by counsel for the Trade Committee, who charged much less for their work.[31] Eighty percent (80%) of the $8,000.00 (or $6,400.00) in total fees

---

**29.** *In re Philadelphia Light Supply Co.,* 39 B.R. 51 (Bankr.E.D.Pa.1984); *In re Evergreen Valley Resort, Inc.,* 27 B.R. 75 (Bankr.D.Me.1983); *Official Unsecured Creditors' Committee v. Michaels (In re Marin Motor Oil, Inc.),* 689 F.2d 445, 7 C.B.C.2d 470 (3d Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983); *In re Cloud Nine, Ltd.,* 3 B.R. 199 (Bankr.D.N.M. 1980); *Matter of Monsour Medical Center,* 5 B.R. 715 (Bankr.W.D.Pa.1980).

**30.** *In re Wesco Products Co.,* 22 B.R. 107 (Bankr. N.D.Ill.1982).

**31.** BIL billed almost $8,000 for 56 hours of legal research, but the brief failed to address the most important legal issues involved.

billed for this work is denied because such work was duplicative and not necessary.

■ *2. Objection to Fees for Billing for Non–Legal Personnel.* The Bank Committee alleges that counsel for the Equity Committee failed to efficiently administer its non-legal personnel working on these cases. Reference to the report of the Fee Application Auditor confirms that BIL billed more for in-house administration than other firms and a review of their fee applications confirms that work done by secretaries was often billed an additional time by the attorney working on the document. Both the Amended Administrative Order III entered April 28, 1987, and the subsequent Administrative Order III amended as of September 10, 1987, require that supervising attorneys and managing professionals in the case economically allocate work among the firm personnel, balancing the needed expertise with the cost of such allocation. *See* Paragraph III., B. of both Orders. As cited in the objection of the Bank Committee, numerous charges are made by paralegals for tasks that are the routine support work normally performed by secretarial staff and generally included in the overhead costs of a law firm, i.e., filing, organizing the firm's internal files, and arranging for copies and distribution of documents. However, this practice was followed to some extent by all professionals, including local counsel for the Bank Committee and the Trade Committee. The Court overrules this objection, as the volume of pleadings in this case made charges for this work necessary by all parties, but will consider the lack of control in this area by BIL in final compensation to be allowed lead counsel.

■ *3. Objection to Fees for Charges for 2004 Examination of Banks.* The Bank Committee asks for denial of $9,087.00 charged by BIL for time spent preparing a 1987 motion for 2004 examination of certain bank creditors and for negotiating document production. The Equity Committee was entitled to examine the DIP's transactions with its secured and partially secured lenders and substantial discretion was given to the Equity Commit-

tee in its timely evaluation of those dealings. Although the Bank Committee alleges that the documents produced were never reviewed by the Equity Committee, the Court accepts and notes reliance on BIL's explanation in response to that allegation. The Court finds the services necessary and the charges reasonable and overrules such objection.

■ *4. Objection to Charges for Fee Application Preparation.* The Bank Committee alleges that the charges of Equity Committee counsel for time spent in the preparation of fee applications may not be reasonable. Summaries filed with BIL's fee applications indicate fees for the preparation of fee applications totaled $67,-330.00. These fees were voluntarily reduced 55% to $36,758.80 by the firm. Based on the argument advanced by the Bank Committee, this Court adopts the method of determining reasonableness of charges for preparation of fee applications as set forth in the decisions *In re Pettibone*, 74 B.R. 293, 304 (Bankr.N.D.Ill.1987) and *In re Wildman*, 72 B.R. 700 (Bankr.N.D.Ill.1987), and will allow each professional employed in this case compensation for time spent in preparation and review of fee applications to the extent such compensation does not exceed 3% of total fees allowed to such professional. Total compensation allowed BIL in the case is $336,-447.67; therefore, 3%, or $10,093.43, is allowed for fee application preparation, and the remaining $26,665.37 requested is denied.

*5. Objection to Fees for Pre–Disclosure Statement Hearing Litigation.* The Bank Committee objects to compensation requested by BIL for representation of the Equity Committee in various proceedings filed immediately after the filing of the debtors' first Disclosure Statement and Plan and prior to hearing on that Disclosure Statement. In its response to the objection, BIL asserts that the Bank Committee has filed the objection in bad faith and argues that it is entitled to the benefits of a compromise reached with counsel for the Bank and Trade Committees, which resulted in a 20% reduction in BIL's fees for

the period of June through October, 1988. The Court considers these issues in sections a. through e. below.

■ a. *Proposed Compromise of Objections.* The Trade and Bank Committees, the DIP and the U.S. Trustee previously objected to requests of BIL for fees in connection with certain litigation instituted by the Equity Committee during the period prior to hearing on the debtors' first Disclosure Statement, including pleadings filed in the Circuit Court of Putnam County, West Virginia to compel a stockholders' meeting and seeking damages from the officers and directors of Heck's, Inc., and a motion filed in this Court for the appointment of a trustee.[32] The basis for the objections to payment of compensation for this work was that the services rendered were unnecessary and were intended to unjustifiably retard the DIP's progress toward successful reorganization.

On December 20, 1988, the Court convened a hearing to consider the objections of the DIP and the Trade and Bank Committees to fee applications of BIL for the periods June 1, 1988 through July 31, 1988, and August 1, 1988 through September 30, 1988,[33] as well as certain objections of BIL to other professionals employed in the case. Prior to the commencement of the scheduled hearing, pleadings were filed which withdrew objections to BIL's fee applications and referenced a voluntary reduction of fees by BIL for the periods in question and fees for October, 1988. Sheila Tolgyesi of the firm of Kirkpatrick & Lockhart, appearing at the December 20 hearing on behalf of the Bank Committee, explained why the Bank Committee withdrew its objection and, after advising the Court of an agreement with BIL to reduce fees for the June—October, 1988 period by 20%, stated as follows:

> Therefore, in reliance on the voluntary 20% reduction, we did withdraw our objection to their fees for those five months.

However, to clarify matters for the Court, all the Bank Committee is doing is withdrawing their objection to Berlack, Israels' fees for those five months.

The Bank Committee does not waive or release any rights to take further action against the Equity Committee's members or its professionals in connection with those motions.

In addition, we feel that we are close to a consensual plan with the Debtors and with all of the Committees. However, we feel that certain possible negligence and/or misconduct in connection with this case should be separated from plan issues and we should go forward with a consensual plan and deal with the other issues separately.

Transcript, December 20, 1988 hearing, at 6–7, Court Docket # 2843.

At that hearing, the Court expressed certain reservations about the standing of an official committee to institute state court proceedings such as had been initiated by the Equity Committee in Putnam County and requested, by Order entered December 23, 1988, copies of pleadings and legal authorities BIL relied upon in instituting the Putnam County action. In that same Order, the Court took approval of the proposed compromise of the objections to compensation for such work under advisement, although no motion was filed seeking approval of the compromise pursuant to Bankruptcy Rule 9019 and no notice was given of the objecting parties' forfeiture of their right to immediate hearing on their objections.

Accordingly, the Court concludes that no motion to compromise was filed, no notice of such compromise was given to creditors, and that, based upon a complete review of the record in this case, had a compromise been properly presented for consideration, this Court could not have found the same to be fair and reasonable, for the reasons

---

32. The Court took the proposed compromise of these objections under advisement on December 23, 1988.

33. October fees had not been objected to at that time and were not to be considered at the scheduled December 20, 1988 hearing on objection to fees.

that will be set forth later in this Memorandum Opinion.

Having disposed of the argument by BIL that the Bank Committee previously compromised its objection to the compensation requested for these services, the Court will consider the pending objection of the Bank Committee in subsections b. through e. which follow.

b. *Objection to Fees for Notices, Objections, Motions, Requests and Interrogatories Served in 26–Day Period.* The Bank Committee's objection to BIL fees requested with respect to the barrage of motions, notices, objections and discovery requests filed in September and October of 1988 is a serious matter. The Bank Committee points to the 26–day period immediately prior to the scheduled Disclosure Statement hearing,[34] in which the Equity Committee, by and through its counsel, served on the DIP, the Trade Committee and the Bank Committee numerous motions, notices, objections and discovery requests.[35] The Bank Committee claims that the "barrage of motions, notices, objections and discovery requests" filed by Equity Committee's counsel was for the improper purposes of harassment and delay and unnecessarily increased the costs of this reorganization in order to obtain unfair leverage in the bankruptcy case. The Bank Committee cites as an example a discovery request[36] served on that Committee by the Equity Committee which duplicated a prior request for documents. The Bank Committee alleges that the banks produced thousands of pages of documents in response to the Equity Committee's first discovery request, which documents were never examined by the Equity Committee, and that

**34.** Hearing was scheduled for October 12, 1988, where the four debtors were to seek approval of the Disclosure Statement filed August 19, 1988 in support of the Plan of Reorganization filed August 1, 1988.

**35.** (1) 9–16–88 Motion for Authority to Commence and Prosecute Adversary Proceeding Against Banks (Court Docket #2370).

(2) 9–16–88 Memorandum of Law in Support of Motion for Authority to Commence and Prosecute Adversary Proceeding Against Banks (Court Docket #2371).

(3) 9–16–88 Objection to Debtors' Disclosure Statement (Court Docket #2372).

(4) 9–16–88 Objection to Banks' Proof of Claim (Court Docket #2373).

(5) 9–16–88 First Request for Production of Documents by Debtors.

(6) 9–26–88 Motion for Continuance of Hearing on Debtors' Disclosure Statement and Motion for Expedited Hearing on said Motion (Court Docket #2400 and Court Docket #2409).

(7) 9–26–88 Objection to Debtors' Motion for Extension of Exclusive Time to Solicit Acceptances to Plan (Court Docket #2402).

(8) 9–26–88 Supplemental Objection to Debtors' Disclosure Statement (Court Docket #2403).

(9) 10–4–88 Interrogatories to Bank Committee and Request for Production of Documents and Things by Bank Committee (Court Docket #2466).

(10) 10–4–88 Interrogatories to Debtors and Second Request for Production of Documents and Things by Debtors (Court Docket #2467).

(11) 10–4–88 Interrogatories to Trade Committee and Request for Production of Documents and Things by Trade Committee (Court Docket #2469).

(12) 10–4–88 Notice of Deposition Upon Oral Examination to Take Deposition of John R. Isaac, Jr., on October 8, 1988 in Charleston, West Virginia (Court Docket #2472).

(13) 10–4–88 Notice of Deposition Upon Oral Examination to Take Deposition of Maarten D. Hemsley on October 7, 1988 in Charleston, West Virginia (Court Docket #2473).

(14) 10–4–88 Notice of Deposition Upon Oral Examination to Take Deposition of William McQuade on October 10, 1988 in Charleston, West Virginia (Court Docket #2474).

(15) 10–4–88 Notice of Deposition Upon Oral Examination to Take Deposition of Brenda Cole on October 10, 1988 in Atlanta, Georgia (Court Docket #2475).

(16) 10–4–88 Notice of Deposition Upon Oral Examination to Take Deposition of Harold Sampson on October 8, 1988 in Milwaukee, Wisconsin (Court Docket #2476).

(17) 10–4–88 Notice of Deposition Upon Oral Examination of and Request for Production of Documents by Frank Millsop on October 10, 1988 in Nashville, Tennessee (Court Docket #2477).

(18) 10–4–88 Notice of Deposition Upon Oral Examination of and Request for Production of Documents by Dom DiNapoli on October 10, 1988 in New York, New York (Court Docket #2478).

(19) 10–4–88 Notice of Deposition Upon Oral Examination of and Request for Production of Documents by Scott C. King on October 11, 1988 in Pittsburgh, Pennsylvania (Court Docket #2479).

(20) 10–11–88 Second Supplemental Objection to Debtors' Disclosure Statement (Court Docket #2514).

**36.** *See* n. 35(9) of this Opinion.

this second discovery request was for the production of the same documents.

. As the Equity Committee evaluated the proposed Plan and Disclosure Statement, it became necessary for the Committee's counsel to depose the Chief Executive Officer and the Chief Financial Officer of the DIP. As BIL notes in their response to the Bank Committee's objection, those depositions brought forth information that the Plan and Disclosure Statement on the table needed revision. Unfortunately for the equity security holders, it does not appear that the information obtained was favorable to their class of claims. Apparently the depositions of Maarten D. Hemsley, Heck's Chief Financial Officer, and John R. Isaac, Heck's Chief Executive Officer, confirmed that the projections contained in the DIP's first Disclosure Statement and Plan of Reorganization were too optimistic. Revenues for the company for the Fall months of 1988 fell below the projections as stated in the debtors' monthly financial reports which were filed with the Court under seal. The DIP subsequently announced its intention to revise those projections and later, after filing a First Amended Disclosure Statement and Plan, filed a Second Amended Disclosure Statement and Plan [37] and reduced the distribution that originally was planned for unsecured creditors.

The Court concludes that the necessary and reasonable work performed by BIL in this time period consisted of the depositions taken of the principal officers of Heck's, some of the work relating to the Committee's objection to the Disclosure Statement, and preparation for and appearance by one attorney at the Disclosure Statement hearing. Accordingly, the objection of the Bank Committee to compensation for the remainder of BIL's work during this period

is sustained, as will be detailed in section e. below.[38]

c. *Objection to Fees for Motion for Appointment of a Trustee.* Also filed by counsel for the Equity Committee just prior to the hearing on the disclosure statement scheduled for October 12, 1988 was an emergency motion for the appointment of an operating trustee.[39] This motion was accompanied by a motion for expedited hearing, an affidavit of Laventhol & Horwath, accountants for the Equity Committee, and a memorandum of law.[40] The emergency motion for appointment of a trustee was filed just six days before the scheduled hearing on the Disclosure Statement. Expedited hearing was granted and a hearing promptly scheduled for October 11, 1988.

The DIP contested the trustee motion immediately and vigorously. In a counter-affidavit of Maarten Hemsley, Chief Financial Officer of Heck's, Inc.,[41] filed in opposition to the emergency trustee motion, it is asserted that the actions of the Equity Committee and its accountants damaged the public and supplier confidence in the company. Hemsley asserted that incorrect financial conclusions and projections had been made by the accountants for the Equity Committee, Laventhol & Horwath, in part because they had not conferred with the accounting professionals of the DIP regarding the method of presentation of information in the company's financial reports. The Equity Committee's motion alleged that the DIP was financially *in extremis*, but the Committee's accountants, according to the Hemsley affidavit, never questioned management of the DIP concerning cash and borrowing positions or other components of working capital,[42] or its expectations for such positions through

---

**37.** The plan confirmed. See Part I.,C. of this Opinion.

**38.** *See* Part IV., A., 5.(e) of this Opinion, *Conclusion and Summary of Fees to be Denied by Virtue of Considerations a. through d. above.*

**39.** Filed on October 6, 1988.

**40.** Docket items Nos. 2490, 2491 and 2492.

**41.** Exhibit E to Heck's memorandum in opposition to emergency motion for a trustee, filed October 11, 1988.

**42.** Confirmed by questions asked by Court of Melvin Rosenstrauch of Laventhol & Horwath at hearing on objection to Laventhol & Horwath fees.

the upcoming Fall 1988 selling season.[43] Hemsley asserted that substantial and real damage was done to Heck's, Inc. by the emergency trustee motion and its attachments, which contained numerous damaging assertions about the DIP's financial condition. Further, according to the Hemsley affidavit, several of the Laventhol & Horwath conclusions about the level of losses being sustained were in error and occurred because of an incomplete understanding of the financial records of the DIP. Significantly, Hemsley asserted that Laventhol & Horwath, in an affidavit of partner Melvin Rosenstrauch, overstated July, 1988 losses by 100% and August, 1988 losses by about $1.5 million, or 150%, because the accountants for the Equity Committee did not properly consider non-operating adjustments.[44] Since the motion for appointment of a trustee was not filed under seal, Hemsley complains that counsel for the Equity Committee caused to be published confidential financial information about the DIP in breach of a confidentiality agreement between the DIP and Laventhol & Horwath and in violation of the company's Securities and Exchange Commission reporting obligations.[45]

BIL came to the October 11, 1988 hearing on the emergency motion for appointment of a trustee and announced the Equity Committee no longer wished to proceed with hearing on their motion for a trustee, that they had entered into a compromise with the Trade and Bank Committees and the DIP, and that they were withdrawing their Putnam County litigation, other pending motions before this Court, and the emergency trustee motion. Further, in what now seems to have been a self-serving effort to save 80% of their fee requests for June through October, 1988, BIL announced they had agreed to proceed with further negotiations to try to reach a consensual agreement to a plan of reorganization. The objection of the Bank Committee to BIL's fees for the motion for appointment of a trustee has substantial merit and a finding will be made in Section e. to follow.

d. *Objection to Fees for Putnam County Litigation.* The Bank Committee also asserts that the litigation which was instituted in the Circuit Court of Putnam County, West Virginia immediately prior to the disclosure statement hearing was for an improper purpose. To understand this objection, the Court has reviewed the pleadings filed in Putnam County. An Application for a Summary Order Compelling Heck's, Inc. to Call and Hold an Annual Stockholders' Meeting [46] was filed by the Official Committee of Equity Security Holders of Heck's, Inc., and stockholders Steven M. Mizel, Willard H. Erwin, Jr., and Dr. Allen S. Tauber, individually, on September 19, 1988. The application was signed by Robert M. Miller of BIL and Frances W. McCoy. Also filed in Putnam County at that time was a complaint of "the undersigned Plaintiffs, the Official Committee of Equity Security Holders ... of Heck's, Inc." and several shareholders, individually and on behalf of all other shareholders of Heck's, Inc. The complaint, signed by Robert M. Miller of BIL, named as defendants the officers and directors of Heck's, Inc., and alleged that by proposing a plan which diluted shareholders' interests in the DIP by 90% and granted certain incentives and employment contracts to senior management, the officers and directors had breached their fiduciary duty and duty of loyalty and good faith to the shareholders. The complaint cited injuries resulting from the corporation's failure

---

**43.** Paragraph 8 of Exhibit E to Heck's memorandum in opposition to emergency motion for a trustee, filed October 11, 1988.

**44.** Paragraphs 20 through 24, Exhibit E to Heck's memorandum in opposition to emergency motion for a trustee, filed October 11, 1988.

**45.** Paragraph 9, Exhibit E to Heck's memorandum in opposition to emergency motion for a trustee, filed October 11, 1988.

**46.** If an annual meeting of stockholders of a business corporation is not held within a 13-month period, West Virginia Code § 31–1–18(c) authorizes the circuit court of the county in which the principal office of a corporation is located to order an annual meeting of stockholders to be held, on the application of any shareholder.

to hold an annual meeting of shareholders[47] for 29 months and wrongful entrenchment of management, and asked for damages in excess of $50 million, plus penalties, damages and costs.

■■■ (i) *Application to Compel Shareholders' Meeting.* Absent other compelling legal or equitable factors, this Court agrees that stockholders have a right to meet and elect directors during reorganization[48] and that a bankruptcy court should not lightly employ its equitable powers to block an election of a new board of directors.[49] Nor should the court discourage equity interests by refusing to approve fees for necessary work. However, courts must recognize that Congress has given jurisdiction of the Chapter 11 process to the district court where the case is pending. Where the purpose of the action to call a meeting of shareholders is to preempt the Chapter 11 reorganization process itself, courts must exercise common sense control. A review of recent court decisions and the Bankruptcy Code was found to be needed before disposing of this objection to fees.

■■■ Under the Bankruptcy Code, the district court has exclusive jurisdiction of all cases. 28 U.S.C. § 1334(a). The district court in which a case under Title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate. 28 U.S.C. § 1334(d). The plan confirmation process in a Chapter 11 reorganization case occurs under the exclusive jurisdiction of the district court as part of a case under Title 11. 11 U.S.C. §§ 1128, 1129. As to confirmation issues, no provision for state court remand is provided, nor is abstention appropriate. *See* 1 COLLIER BANKRUPTCY MANUAL, 3d ed. (MB), ¶ 3.01[1][c]. The Code permits a plan to alter creditor and shareholder state law rights.[50] The effect of confirmation of a plan on all parties in interest, including equity security holders, as set out in 11 U.S.C. § 1141 is important to the present case:

> [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141(a).

Legislative history confirms that one of the fundamental functions of modern bankruptcy legislation is to slow down the race of creditors to collect from a troubled debtor and to shield the debtor from creditor demands until reorganization is implemented or until an orderly and equitable distribution of the debtor's property can be made.[51] Through the Bankruptcy Code, Congress has provided unique prerogatives to debtors under the law to enhance reorganization possibilities. The confirmation process, a federal remedy in a Title 11 reorganization by which debtors may alter the state law rights of creditors and stockholders through a plan of reorganization, is

---

**47.** In response to an inquiry of the Court, it appears that prior to this suit no demand had been made by the Equity Committee for an annual shareholders' meeting. *See* Court's Order of December 23, 1988, that directed counsel for the Equity Security Holders' Committee to file documents (Court Docket #2822) and the response thereto filed January 9, 1989 (Court Docket 2859).

**48.** *In re Bush Terminal Co.,* 78 F.2d 662 (2d Cir.1935); *In re Saxon Industries,* 39 B.R. 49 (Bankr.S.D.N.Y.1984); *In re Lionel Corp.,* 30 B.R. 327 (Bankr.S.D.N.Y.1983).

**49.** *In re Potter Instrument Co., Inc.,* 593 F.2d 470, 475 (2d Cir.1979), *quoted in Manville Corp. v. Equity Security Holders' Committee (In re Johns–Manville Corp.),* 801 F.2d 60, 64 (2d Cir. 1986), *on remand* 66 B.R. 517 (Bankr.S.D.N.Y. 1986).

**50.** 11 U.S.C. §§ 1122, 1123(b)(1), 1129, 1141.

**51.** House Report (Reform Act of 1978), H.R. Rep. No. 595, 95th Cong., 1st Sess. 174–175 (1977); Senate Report (Reform Act of 1978), S.Rep. No. 989, 95th Cong., 2d Sess. 49–50 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5835, 5836, 5963, 6134, 6135.

one of those unique prerogatives.[52] A plan may impair any class of claims or interests.[53] 11 U.S.C. §§ 1123(b)(1), 1141. Creditors are protected also and have the right to organize and employ professionals to make certain they are treated fairly by class. 11 U.S.C. §§ 1102, 1103.

The Bankruptcy Code provides for an exclusive period of 120 days after the order for relief under Chapter 11 in which only the debtor may file a plan, and this exclusive period may be extended by the court. 11 U.S.C. § 1121. Unless otherwise provided, the confirmation of a plan terminates all rights and interests of equity security holders provided for by the plan. 11 U.S.C. § 1141(d)(1)(B). A debtor in possession in Chapter 11 reorganization has the power, over the objection of the shareholders, to dilute the shareholders' interests by issuing new stock or to divest the shareholders of those interests entirely, where unsecured creditors will not be fully paid the allowed amount of their claims and one class of creditors with impaired claims accepts the plan. 11 U.S.C. § 1129(a), § 1129(b)(1), § 1129(b)(2)(B)(ii), § 1141. Further, the United States Supreme Court, in the case of *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), confirmed that under the absolute priority rule,[54] "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Ahlers*, 485 U.S. at 202, 108 S.Ct. at 966, *quoting In re Ahlers*, 794 F.2d 388, 403 (8th Cir.1986).[55]

In September of 1988, at the time counsel for the Equity Committee instituted a proceeding in the Circuit Court of Putnam County to compel the DIP to hold an annual stockholders' meeting for election of directors and also filed the complaint against the directors and officers asking for damages, Heck's, Inc. had filed a Plan and Disclosure Statement and was within an extended exclusionary period in which only the DIP could file a plan.[56] The proposed Plan was supported by the debtors and two of their official committees. The Disclosure Statement filed with that Plan reflected that the post-petition DIP had become balance-sheet insolvent. As was discussed above in Part II., C., 3., steady losses the DIP had sustained post-petition resulted in a negative equity position as of May 28, 1988. Further, under the DIP's first proposed Plan, all unsecured pre-petition creditors were impaired.[57] The Plan called for the cancellation of all existing shares issued by Heck's, Inc., and provided that holders of those cancelled shares would receive approximately 10% of the new shares to be issued by Heck's, Inc. after emerging from reorganization.[58]

---

**52.** "An order confirming a plan is a judgment *in rem* in the sense that it is a determination of the rights and liabilities created by the plan, binding upon all parties in interest ..." 5 COLLIER ON BANKRUPTCY, 5th ed. (M.B.) ¶ 1141.01[1]. Confirmation of a Chapter 11 plan invokes the doctrine of *res judicata* as to matters which are covered by the plan. *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938), *reh. denied* 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938); *Virgin Islands Bureau of Internal Revenue v. St. Croix Hotel Corp.*, 60 B.R. 412, 14 C.B.C.2d 1098 (D.V.I.1986).

**53.** For definition of impaired claim, *see* 11 U.S.C. § 1124.

**54.** 11 U.S.C. § 1129(b)(2)(B)(ii).

**55.** At confirmation, no investment banker having been employed to value the enterprise, the Court had only the projections of the DIP contained in the Second Amended Disclosure Statement to value the new common stock to be issued. That estimate of $15,000,000 was ac-

cepted by the Court. *See also* analysis in *Claims Treatment and Enterprise Value of the Debtor in Possession*, Part II., C., 3. of this Opinion.

**56.** By this Court's Order entered June 29, 1988, the time within which the debtors had the exclusive right to file a plan of reorganization was extended until August 1, 1988. No appeal of such extension was filed and the debtors' first Plan of Reorganization was filed on August 1, 1988.

**57.** Analysis in Part II., C., 3. of this Opinion shows that in all plans submitted and considered, at no time were unsecured creditors or partially secured bank creditors expected to be paid the full value of their claims.

**58.** The Disclosure Statement filed August 19, 1988 in support of the Plan, in compliance with 11 U.S.C. § 1125(b), contained a projected balance sheet for the DIP. That balance sheet projected that stockholders' equity as of December 31, 1988 would be a negative $30 million.

This dilution of equity interest would substantially reduce the number of directors which then-existing equity interest holders would be able to select if the Plan were confirmed. The Second Amended Plan, confirmed, later treated equity interests in much the same way as the Plan filed August 1, 1988.

Equity Committee counsel cites *In re Johns Manville Corp.*, 801 F.2d 60 (2d Cir.1986) in support of their action seeking an order of the state court to compel a stockholders' meeting to elect directors. In *Manville*, the debtor corporation had obtained an injunction when an equity security holders' committee attempted to compel a shareholders' meeting to elect new directors on the eve of Manville's filing of a plan which would dilute shareholder interests. The Second Circuit, in considering the equity committee's appeal, stated that the committee's right to call a meeting may be impaired only if the equity committee is guilty of "clear abuse" in attempting to call one. *Manville*, 801 F.2d at 64. The case was remanded for an analysis of the risks to rehabilitation posed by the equity committee's call for a meeting to achieve reconsideration of Manville's proposed plan. On remand, the court found that a meeting to elect directors to reconsider a plan approximately three years in the making, in perhaps the most complex bankruptcy case in history,[59] *was clear abuse.*

In support of its actions, BIL also relies on *The Official Committee of Unsecured Creditors of Allegheny International, Inc. v. Allegheny International, Inc. (In re Allegheny International, Inc.)*,[60] a May 31, 1988 unpublished opinion by the United States District Court for the Western District of Pennsylvania. The decision of that court held that facts in the case did not show a need sufficiently compelling to uphold a bankruptcy court's decision to enjoin an annual stockholders' meeting. This decision was appealed to the Third Judicial Circuit, but was voluntarily withdrawn by the parties before being heard.

While the debtor in *Allegheny* had not yet filed a plan, it was within the 120–day exclusive period provided by 11 U.S.C. § 1121(b). The *Allegheny* decision, on which BIL relies, is not well reasoned and is not applicable to this case. While it notes that the bankruptcy court expressed that the proxy battle at issue was inconsistent with the 120–day period in which only the debtor may file a plan of reorganization, the district court did not discuss what Congress intended by granting exclusive jurisdiction in all reorganization cases under Title 11[61] and exclusive jurisdiction over all of the property of the debtor and of the estate[62] to the district courts. The district court did not consider in its ruling the power given to a debtor by 11 U.S.C. § 1141 to realign equity interests, although the decision does recognize that "in bankruptcy, the interests of shareholders, to some extent, become subordinated to the interests of creditors." The *Allegheny* court ignores a feature which lies at the heart of bankruptcy legislation, the shielding of the debtor from competing demands until reorganization is accomplished. It also ignores the feature which permits the adjustment of interests by plan litigation in a Chapter 11 case.

In the case before this Court, the Equity Committee's attempt to compel a stockholders' meeting in September, 1988 to elect directors was particularly inappropriate in light of the fact that financial information had been continually available to the Equity Committee and BIL,[63] and that such

---

The continuing losses reflected in periodic income statements filed post-petition and the projected loss of all net worth by December 30, 1988 supported the fairness of the Plan's proposed dilution of shareholder interests. *See* Part II, C., 3. of this Opinion.

**59.** *Manville,* 801 F.2d at 69. (Oakes, J., dissenting.)

**60.** Civ.Act. No. 88–1101, Bankr. No. 88–448, Adv. No. 88–191.

**61.** 28 U.S.C. § 1334(a).

**62.** 28 U.S.C. § 1334(d).

**63.** *See* SEC Form 10–Q, May 28, 1988, Exhibit 3 to debtors' first Disclosure Statement, filed August 19, 1988.

financial information disclosed that the shareholders were no longer providing the DIP's working capital, that the unsecured creditors, bank and trade creditors were providing the DIP's working capital, and that that capital was funding the DIP's continuing losses.[64] Further, pursuant to the terms of a Plan and Disclosure Statement filed during the exclusive period, shareholders' rights would be reduced by 90%.

Equity holders displeased with the actions authorized by a debtor's board of directors in advancing a plan for confirmation are not without remedy. Among other remedies, shareholders on their own or through an equity shareholders' committee may appear at the required hearing on the disclosure statement, may employ experts such as investment bankers (an equity committee may do so at estate expense in reasonable amounts) to test whether creditors above them in the priority chain are being overpaid, may object and request disapproval of the disclosure statement,[65] may be heard at the confirmation hearing and vote against the plan,[66] or may, for cause, move to appoint or remove a trustee.[67] (For other reasons, shareholders could move to dismiss the case or convert it to a Chapter 7.)[68] Once the mandated 120–day exclusive filing period has ended, shareholders may request permission to file a plan or object to the extension of the exclusive filing period and, if successful, file their own plan.

Because the filing of a plan which proposes to dilute current shareholders' interests commences litigation on the rights of those shareholders to determine management of the corporation, those shareholders must bring their pleas for relief to the court with exclusive jurisdiction over the confirmation process.[69]

■ This Court holds that where a debtor in possession properly and in good faith places before the court a plan which proposes to dilute or extinguish the interests of its existing shareholders, then the right to select the directors of that debtor in possession is in litigation under the exclusive jurisdiction of the district court, inextricably tied to the confirmation process. Where a properly filed plan is before the court, and the right to issue voting stock and select directors is being litigated in the confirmation process, the exclusive jurisdiction of the federal court precludes an official committee in the case or its court-approved professionals from attacking the plan in state court. To allow the shareholders under these conditions[70] to elect directors at a meeting of shareholders would frustrate Congress' grant of exclusive jurisdiction to the district courts in 28 U.S.C. § 1334 and would subvert the bankruptcy process. It follows that because an equity committee has no right to put the reorganization process at risk by a state court proceeding, its counsel has no right to demand payment for initiating that proceeding. Therefore, BIL's efforts to compel a stockholder meeting were improper and not necessary.

■ (ii) *Complaint Against Officers and Directors.* The complaint against the officers and directors of Heck's, Inc.[71] was filed by the Official Committee of Equity

---

**64.** *See* Part II,C. of this Opinion.

**65.** Bankruptcy Rule 3017.

**66.** 11 U.S.C. §§ 1126(a), 1127(d).

**67.** 11 U.S.C. §§ 1104, 324.

**68.** 11 U.S.C. § 1112(b).

**69.** A bankruptcy court's authority to hear these matters on referral by the district court is set out in 28 U.S.C. § 157, which section also provides guidance as to circumstances which may cause reference to be withdrawn in connection with such a suit.

**70.** As has been shown in Part II of this Opinion, the post-petition losses of the DIP had extended to the point that the unsecured trade and bank creditors were now providing the working capital of the DIP which was being depleted with each succeeding month.

**71.** Application for removal to the District Court was filed by the DIP October 4, 1988. On October 11, 1988, plaintiffs filed a motion for the court to abstain from taking jurisdiction or to remand to the Circuit Court of Putnam County. On the same day, BIL announced Equity Committee's withdrawal of this litigation. *See* Part IV.,C.,5. of this Opinion.

Security Holders of Heck's, Inc., Steven M. Mizel, Willard H. Erwin, Jr., and Dr. Allen S. Tauber, individually and on behalf of all other shareholders of Heck's, Inc. Named defendants were John R. Isaac, Jr., Maarten D. Hemsley, Kathy M. Hurley, William K. Bragg, Jr., Brenda Cole, and Gerald Eppner, Esquire. All defendants were directors of Heck's, Inc. Isaac, Hemsley, Hurley and Bragg were also officers of the corporation. In claiming that the defendants had breached their fiduciary duty of loyalty and good faith to the shareholders and had wrongfully entrenched management in the corporation, the plaintiffs cited in support of their allegations many actions which the directors took as part of their efforts to advance a confirmable Chapter 11 plan.

Plaintiffs complained that the senior management of Heck's, Inc., who allegedly dominated and controlled the board of directors, proposed a plan which diluted the shareholders' interests while giving shares of stock and other benefits to senior management. While the Equity Committee may have raised valid questions about benefits which would flow to management under the Plan, the central focus of the complaint was the proposed Plan and its provisions, including the dilution of shareholders' interests. Under the circumstances existing at the time,[72] the dilution of those interests was not only valid but was required to achieve a fair and equitable plan.

Plaintiffs complained that defendants would be wrongfully entrenched in the corporation as a result of management contracts provided for them as part of the Plan. It is important to note here that the Equity Committee had a substantial hand in negotiating the DIP's original management contracts with John Isaac, Maarten Hemsley and Kathy Hurley[73] in effect at the time the complaint was filed. These original management contracts also contained stock options for such officers.

The complaint also cited the defendants for failing to pursue preference and fraudulent conveyance claims against certain banks. However, at the time this action was filed in Putnam County Circuit Court, these preference claims were the subject of a compromise pending before this Court in a Plan and Disclosure Statement.

The plan litigation process in this Court was the only forum in which Equity Committee's counsel could properly raise concerns about the above issues as they related to shareholders' treatment under the Plan or management's stewardship of the corporation. This is not to say that the individual shareholders have no right to obtain private counsel and bring a state action against directors and officers for actual wrongdoing. That question is not before the Court in this case. The Equity Committee agreed to drop its state damage action 25 days after it was filed as part of an attempt to have this Court approve 80% of BIL fees billed during the June—October, 1988 period. The sole motivation for bringing this complaint seems to have been to obstruct the Plan confirmation process.

▓▓▓ The Bank Committee, the Trade Committee and the Assistant U.S. Trustee all strenuously objected to payment of fees to counsel for the Equity Committee for representing shareholders in a state court action seeking damages from the DIP's board of directors and officers on behalf of private plaintiffs.[74] At the hearing on a motion of the Equity Committee to continue the Disclosure Statement hearing, counsel for the DIP called the Putnam County actions "outrageous." The Court believes this to be an understatement. It is clear, from looking at Bankruptcy Code §§ 1103(c) and 1109(b), that BIL led the Committee outside the parameters of its authorized mission in involving the official

---

**72.** *See* Part II.,C.,3. of this Opinion.

**73.** *See* Applications of DIP to employ John Isaac, Maarten Hemsley and Kathy Hurley, Court Docket Nos. 766, 1148 and 1145.

**74.** Objection of the Official Trade Creditors' Committee and the Official Bank Creditors'

Committee filed November 28, 1988, Docket #2727; Comments of Assistant United States Trustee on Applications for Compensation of Professionals filed October 17, 1988, Docket #2569.

Committee in this state lawsuit against the officers and directors of the DIP, violated the exclusive jurisdiction granted the District Court,[75] and introduced unnecessary expense and confusion into the case. This Court finds that BIL brought a frivolous damage action in state court.

Counsel's work in this matter was not necessary and does not support an administrative expense claim (which would be paid ahead of unsecured pre-petition claims) for professional fees in this case. Professionals employed to represent a class of claims in a reorganization case under Title 11 have a duty to recognize the exclusive jurisdiction of the federal district court once plan litigation commences and, under Bankruptcy Rule 9011, may be held responsible for expense or injury to the debtor's estate if they file pleadings for improper purposes and subject the debtor in possession to litigation in a court with no jurisdiction to rule on the proposed reorganization. 28 U.S.C. § 1334(a) and (d); Bankruptcy Rule 9011. The Court will deny BIL all fees requested in connection with the Putnam County litigation because the action was improper and brought for an improper purpose. Further, because of the DIP expense this action caused, this Court will reduce allowed fees otherwise payable to BIL by $91,582.25,[76] the amount which Heck's had to expend to indemnify its officers and directors for attorney fees to defend the Putnam County damage action.[77]

■■■ (e) *Conclusion and Summary of Fees to be Denied by Virtue of Considerations a. through d. above.* Considering the financial condition of the DIP and all evidence of its enterprise value at the time of the litigation in the Circuit Court of Putnam County, the motion for trustee

having been filed without reasonable preparation by BIL, the lack of care shown as to the use of information that Laventhol & Horwath had agreed to keep confidential, and the institution of actions in state courts where the District Court had exclusive jurisdiction, this Court is led to believe the Bank Creditors' Committee has properly characterized the litigation commenced by the Equity Committee in September and October, 1988 as solely for the purpose of extorting a settlement or extorting a compromise for equity interest holders above and beyond that to which they were entitled.[78] Based on the response of BIL to the objection of the Bank Committee[79], there appears to be some agreement among counsel with a major part of the Bank Committee's objection. BIL asserts on page 13, paragraph 21 of their response that because shareholder interests were being abused and ignored by the debtors, the Trade and the Bank Committees during negotiations for a plan of reorganization, the Equity Committee had no choice but to explore and implement legal strategies designed to address matters that the above parties would not discuss. It is significant that BIL's response does not assert that any of the litigation they initiated in September and October, 1988, would alter payout rights of equity creditors or return the DIP to the level of profitability that would support a plan of reorganization which would provide full payment to unsecured creditors and any substantial dividend to equity security holders.

The great majority of the pleadings filed in this Court in the 26–day period,[80] including the litigation seeking the appointment of a trustee, is found by the Court to have

---

**75.** 28 U.S.C. § 1334.

**76.** At pages 21 and 22 of the Transcript of a December 20, 1988 hearing on various objections to BIL fees, the Court informed BIL that consideration was being given to this assessment.

**77.** Court's Order entered March 29, 1987, authorized the DIP to reimburse its officers and directors $91,582.25 for counsel fees and expenses related to their defense in the Putnam County litigation.

**78.** *See* Part IV.,D. of this Opinion for quotations from two paragraphs of the Memorandum of Law in Support of the Objection of The Official Bank Creditors' Committee of Heck's, Inc. to Fee Applications of Berlack, Israels & Liberman, Court Docket # 3597.

**79.** *See* Court Docket # 3693.

**80.** Part IV.,5.,a. through d. of this Opinion.

been filed purely for reasons of harassment, delay and intimidation, and therefore was improper.[81] Contrary to the assertion in BIL's response to the Bank Committee's objection that distribution to shareholders doubled,[82] no net gain in payout was achieved for their clients as a result of the ensuing fray,[83] but even if BIL had been successful in improving the payment to shareholders, their means were not justified.

To hold that work done for such improper purposes was necessary in the course of representing the interests of equity security holders would ignore any common sense understanding of an attorney's duty to advise his client as to his rights and would endorse the apparent self-interest that has been pursued by BIL in this case. The Court rejects BIL's assertion that the work was necessary and sustains most of the Bank Committee's objections to these fees. Of fees objected to by the Bank Committee and determined by the Court to represent work on pre-Disclosure Statement hearing litigation, $11,316.50 is allowed for deposing officers of the DIP and $98,317.50 is denied.[84] Further, allowed fees of $91,582.25 will be reduced pursuant to the findings stated here and in Part IV., A., 5., d., ii. of this Opinion, because of the expenses the DIP incurred to indemnify its officers and directors from the meritless damage action filed by BIL.[85] As to expenses for this period, $1,299.90 is denied.[86]

**B. REPRESENTATION OF LAVENTHOL & HORWATH ON APPEAL.**

■ The U.S. Trustee objects to compensation of BIL for their work in representing Laventhol & Horwath in their appeal from an Order of this Court pertaining to the accounting firm's fees. The objection of the U.S. Trustee asserts that such work goes beyond the scope of BIL's authorized employment as counsel for the Equity Committee. The objection itemizes fees of $1,542.24 and expenses of $614.25 charged by BIL for work relating to such appeal. In its response to the objection, BIL states that no limitation with respect to appeals of fee decisions has been imposed by the Order approving its retention as counsel for the Equity Committee, by the Bankruptcy Code, or by the District Court when considering prior appeals by the Equity Committee with respect to its professionals' compensation.

The Court rejects this argument and finds that the work of BIL in presenting an appeal from the Order of this Court partially denying compensation of Laventhol & Horwath is not necessary to the representation of the Equity Committee and is outside the scope of their authorized employment as counsel for the Equity Committee. There has been no showing that such service should be a claim on estate funds that are insufficient to pay general unsecured creditors in full.

The Court accepts the argument of the U.S. Trustee that such work by BIL is

---

**81.** Bankruptcy Rule 9011.

**82.** Response of BIL to Objection by the Bank Creditors' Committee, filed November 20, 1989, at 5 (Court Docket # 3693).

**83.** *See* Exhibit B to this Opinion. The only opportunity for shareholders to increase their payout under the Second Amended Plan was by exercising warrants for 60,000 shares at $100.00 each.

**84.** *See* Chart, *Summary of Equity Counsel Fees Objected to by Bank Committee,* in Part IV., A. of this Opinion.

**85.** Bankruptcy Rule 9011(a) states, in pertinent part:
> If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it,

the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

**86.** The Court reviewed the expense applications for the months not considered under previous order and denies reimbursement of expenses for overnight courier, use of which was not justified under the circumstances:

| | |
|---|---|
| June 1—July 31, 1988 | $ 235.38 |
| August 1—August 31, 1988 | 695.40 |
| October 1—October 31, 1988 | 305.24 |
| September 1—September 30, 1988 | 63.88 |
| Total Expenses Denied | $1,299.90 |

beyond the scope of their authorized employment as counsel for the Equity Committee and denies allowance of fees in the amount of $1,542.24 for such work and denies reimbursement of expenses in the amount of $614.25 for court reporter and filing fees relating to the appeal.

## C. MOTION OF BERLACK, ISRAELS & LIBERMAN TO RECONSIDER ORDER OF AUGUST 11, 1987.

 BIL filed a motion on August 21, 1987 for reconsideration of this Court's Order of August 11, 1987 ruling on fees billed for the periods March 25, 1987 through May 31, 1987. Hearing on the motion to reconsider was held on October 5, 1987 and the matter was taken under advisement. The motion for reconsideration raises several issues. The first is that the Court treated BIL differently than other firms with respect to interim fees awarded through May 31, 1987 when it reduced the hourly rates of compensation of four attorneys associated with BIL. A review of the August 11, 1987 Order indicates that five professionals with the firm had rates reduced in connection with service for that period and that the total fees denied as a result of the rate reduction were $12,-580.00. Of the total reduction at issue, $6,912.00 became moot as a result of an October 2, 1987 Order of the Court which reduced the maximum rate of compensation for legal professionals in this case from the New York area to $200.00 per hour. That $200.00 limitation has since been applied uniformly by the Court. With respect to 71.5 hours of billings by Mr. Nolan, 121.9 hours of billings by Ms. Koval, and 11.2 hours of billings by Mr. Fox, for whom hourly rates of compensation were reduced from $155.00 to $130.00, $130.00 to $100.00, and $120.00 to $100.00, respectively, the Court concludes that the motion to reconsider should be granted and fees previously denied in the amount of $5,568.00 should be restored.

 1. *Fees Denied for Costs for Gaining Employment by the Equity Committee.* The firm further takes issue with $5,000.00 in fees that were denied as an estimate by the Court of the sum counsel sought for work in connection with gaining employment by the Equity Security Holders' Committee. BIL takes exception to the denial of the $5,000.00 as not justified by the fee application, and indeed it is difficult to tell whether that sum is accurate. The Court had to estimate that sum because of the failure of the firm, contrary to the provisions of Administrative Order III, to identify the amount of time spent on each task. The Court stands by that estimate, noting that compensation of $4,360.00 was denied the firm of Jackson & Kelly and compensation of $4,941.00 was denied the firm of Otterbourg, Steindler, Houston & Rosen for similar reasons, and that it does not appear that BIL was treated more stringently than were other firms. Therefore, the motion to reconsider the denial of these fees is denied.

2. *Fees Denied for Travel.* Next, BIL takes exception to charges for travel which were denied in the amount of $5,200.00 and asserts that other firms that did not identify specific tasks accomplished while traveling were not similarly treated. The Court takes issue with BIL's assertion that it was not treated on like terms with other firms in disallowance of time spent traveling. BIL's description of work performed during this period is scant and it was impossible for the Court to determine what time was spent traveling, eating and working. The Court made its best estimate of time spent enroute based on the information provided by BIL in comparison with time charged by other professionals attending the same meetings, resulting in a reduction of $5,200.00.[87] All firms who billed during this period had their applications reviewed in the same light. Jackson & Kelly, Goodwin & Goodwin and Frances McCoy had fees denied, albeit for reasons other than excess travel time, but the charges were denied using the same standards as were applied to Berlack. Upon reconsideration of the requested compensation for travel time, the Court denies such compensation.

**87.** *See* itemizations of work of BIL for 4/1/87, 4/27/87, 4/30/87, 5/25/87.

■ 3. *Fees Denied for Failure to Document Charges, Allocate Work and Control In–Office Conferences.* The firm asks for reconsideration of the denial by this Court of $5,000.00 in professional fees for the period in question for the firm's failure to adequately document charges and allocate work economically among associates and its failure to eliminate excessive in-office conferences. The Court believes there is merit in the motion for reconsideration, but the Court has been hampered by the poor itemization provided in the fee application. Robert Miller, James Nolan and Arlene Koval logged in considerable billable hours, the merit of which has been difficult to judge. Several 12– and 13–hour days are billed at hourly rates. The time spent in conference by the firm members seems excessive and the subjects being worked on are not well-identified. However, because Administrative Order III did not require itemization at the time of the application, $2,500.00 will be allowed on reconsideration.

■ 4. *Expense Reimbursements Denied.* BIL further challenges the denial of reimbursement of expenses of $1,500.00 and argues that their expenses were documented at least as well as those of other firms whose expenses were allowed. The Court notes that BIL has filed a supplement to its application which responds to the Fee Auditor's comments. In connection with this point, the Court believes that denial of $1,500.00 for expenses is justified. While BIL attempted to properly document the expenses in its supplement, the type of expenses requested were clearly not allowable pursuant to the administrative orders.[88]

Of the $27,780.00 in fees reconsidered by the Court, $8,068.00 is restored for the reasons stated above, and $19,712.00 is denied. The $1,500.00 in expenses reconsidered is denied in total.

D. FINDINGS WITH RESPECT TO RATES OF COMPENSATION TO BE ALLOWED TO MEMBERS OF BERLACK, ISRAELS & LIBERMAN.

■ In an attempt to provide equity in the compensation of professionals, the Court now reviews the rates of compensation requested by members of BIL to determine whether or not their rates are reasonable and allowable in light of the work performed. Special attention is given to the rates of compensation to be allowed lead counsel because, pursuant to Administrative Order III, it was lead counsel who was assigned the responsibility of managing professionals and adhering to 11 U.S.C. § 330.[89] Lead counsel for the Equity Committee was Robert Miller of BIL. Mr. Miller supervised other members of his firm, as well as local counsel for the Equity Committee, during their employment. Further, Administrative Order III, Part VI., gave notice of sanctions for non-compliance with such Order and specifically stated that the Court retained the discretion to disallow or to subordinate requests for compensation, in whole or in part, to the pre-petition claims of unsecured and/or equity creditors.

The Bank Committee in its memorandum of law supporting its objection made a serious, substantial allegation about the conduct of Mr. Miller in the representation of equity interests in this case which was not challenged or denied in BIL's response to

---

**88.** Denial was based on charges for "messenger," $96.75; "Ground Transportation, Local," $485.55; "Secretarial Overtime," $592.23; "Velobinding," $21.00; "Document Retrieval," $239.99; "Temporary Personnel," $150.00. These charges total $1,586.52.

**89.** Specifically, Administrative Order III provides in III.,B., *Allocation of Work:*

Supervising attorneys and managing professionals shall strictly adhere to 11 U.S.C. § 330 in determining the allocation of work to be performed by their firms and shall exercise control over time spent by associates and paralegals on research, revision, and editing. Work shall be assigned to available professionals so as to obtain reliable results in the most economical fashion possible. Supervising attorneys and managing professionals shall certify that each function for which compensation is sought has been performed by the most suitable available professional or support person, measured by a balance of needed expertise in the subject area and the hourly billing rate of available persons.

the objection. Specifically, the Bank Committee has alleged that:

> In the Spring of 1988, the Debtors and their counsel began meeting with the Trade Committee, the Bank Committee, the Equity Committee and their respective counsel, in an attempt to negotiate a consensual plan of reorganization for the Debtors. The negotiating sessions attended by Equity Counsel generally were unproductive, consisting of threats and outrageous demands by Equity Counsel with respect to its clients' recoveries under the Debtors' plan of reorganization.
>
> ... On several occasions, Equity Counsel attempted to browbeat and intimidate counsel for the Debtors, the Trade Committee and the Bank Committee with threats of all-out "warfare" if the Plan was not altered to provide the Stockholders with a yet more generous recovery.

Memorandum of Law in Support of the Objection of the Official Bank Creditors' Committee of Heck's, Inc. to Fee Applications of Berlack, Israels & Liberman, Court Docket No. 3597.

Out of concern that BIL would represent the Equity Committee in such a fashion, this Court entered an order on October 19, 1987 refusing BIL permanent employment by the Equity Committee. The District Court correctly overruled that Order as being too great an exercise of judicial discretion over the right of the Equity Committee to select its counsel. Pursuant to the directions of the District Court, BIL was reinstated. Thereafter, actions were taken on interim fee requests for BIL that are consistent with allowances to other firms, with the exception of the period of time beginning in June, 1988, for which interim compensation allowances have been deferred for reasons previously noted. The Court has considered the compensation to be allowed lead counsel who has (1) supervised a legal team which filed pleadings seeking relief to which his client was not entitled;[90] (2) apparently failed to advise his client of the limitations on equity security holders' right to recover in this case;[91] (3) filed pleadings that damaged the chances of a successful reorganization without full and adequate evaluation of the facts necessary to support such pleadings;[92] failed to comply with the terms of Administrative Order III[93] which required compliance with 11 U.S.C. § 330 and to manage the legal resources available "to obtain reliable results in the most economical fashion possible;"[94] and (5) instituted litigation which had no merit.[95]

90. *See* Part IV., A., 5., c., Part IV., A., 5., d, and Part IV., A., 1., a. of this Opinion.

91. *See* Part II., C., 3. and Part IV., A., 5 of this Opinion.

92. *See* Part IV., A., 5., c. of this Opinion.

93. Administrative Order III as amended states:

III. *Allocation of Workload of Professionals and Review and Approval of Professional Fee Applications*

A. *Authorization to Perform Services and Review of Fees.* The Court hereby designates the chairman of each Court-appointed committee to manage the Court-appointed professionals for that committee. The chairman must, with approval of the committee, authorize the work to be done by the professionals employed by his committee and shall review and submit, under his signature, fee applications for committee professionals only for work authorized by the committee and in amounts approved by the committee. The Committee Chairman shall select a supervising attorney or supervising professional from the members of the firms employed to represent the Committees.

B. *Allocation of Work.* Supervising attorneys and managing professionals shall strictly adhere to 11 U.S.C. § 330 in determining the allocation of work to be performed by their firms and shall exercise control over time spent by associates and paralegals on research, revision, and editing. Work shall be assigned to available professionals so as to obtain reliable results in the most economical fashion possible. Supervising attorneys and managing professionals shall certify that each function for which compensation is sought has been performed by the most suitable available professional or support person, measured by a balance of needed expertise in the subject area and the hourly billing rate of available persons.

94. *See* Part IV., A., 1., a. through g. of this Opinion.

95. *See* Part IV., A., 5. of this Opinion, and Memorandum Order of the U.S. District Court for the Southern District of West Virginia entered February 4, 1988, at 3, regarding appeal by Equity

At the beginning of this case, in keeping with the Equity Committee's right to do so, lead counsel for BIL critically examined actions of past management, helped in recruiting new management, and examined in depositions and hearings before this Court the plans of the DIP to close stores. However, beginning in June, 1988, lead counsel of the Equity Committee launched a barrage of meritless demands and threats, characterized by the Bank Committee as outrageous, that were intended to coerce other creditors in the case and put in jeopardy the ability of the DIP to provide recovery for anyone. These actions were improper in the representation of equity interests and damaged the DIP by creating substantial administrative expense, delay and confusion.

Against this background, the Court must decide the rate of compensation to be appropriately permitted Mr. Miller. Clearly, $200.00 an hour is inappropriate. In fact, the Court can justify no rate for such work. Accordingly, the Court approves fees for Mr. Miller at the requested rate of $200.00 an hour for the period of his employment through June 1, 1988, with the exception of those periods where specific time charges have been disallowed, and allows counsel the requested rate of $200.00 an hour for the few services rendered after June 1, 1988 which clearly were for appropriate and necessary services, such as examination of the Disclosure Statement and Plan. However, no compensation shall be approved by this Court for the great majority of hours billed by Mr. Miller since June 1, 1988, which have been the subject of objection by the Bank Creditors' Committee and, to some extent, by the U.S. Trustee, which have been found by this Court to be for services rendered inconsistent with the requirements of Bankruptcy Rule 9011 and Administrative Order III, and which threatened the very possibility of reorganization.[96]

BIL is therefore denied compensation for work performed by Robert Miller from June 1, 1988 through September 30, 1989 in the amount of $57,596.00. No reduction has been made for compensation which was denied Mr. Miller for other reasons.

Further, the U.S. Trustee's comments, filed in response to several fee applications of BIL, call the Court's attention to periodic increases in the hourly rates of associates employed by BIL. No justification can be found for increasing the rate of Mark Frankel in July, 1989, from $155.00 per hour to $175.00 per hour, nor can justification be found for increasing the rate of James M.Nolan in August, 1988 from $155.00 per hour to $185.00 per hour, especially in light of the meritless motions pursued at the direction of lead counsel. The objection of the U.S. Trustee to the increase of these rates is sustained and $4,606.80 is denied.

### EXHIBIT A

Article XIII, Paragraph F, Estimated Recoveries Under the Plan From the Debtors' Original Disclosure Statement Filed August 19, 1988

F. Estimated Recoveries Under the Plan.

| | Class | Cash (a) | Debentures (b) | Promissory Notes (c) | New Common Stock (d) | Total |
|---|---|---|---|---|---|---|
| 1. | Administrative, Priority and Tax Claims | 100.0¢ | | | | 100.0¢ |
| 2. | Adequately Secured Claims | 36.7¢ | | 63.3¢ | | 100.0¢ |

Committee of approval of sale of Federal Wholesale Company; *see also* Part IV., 5., C. and D. of this Opinion.

**96.** Great weight has been given by this Court to the response of BIL to the objection of the Bank Creditors' Committee where there has been no denial of the hostile and litigious attitude alleged to have been commenced by Mr. Miller in June, 1988.

| | Class | Cash | Debentures | Promissory Notes | New Common Stock | Total |
|---|---|---|---|---|---|---|
| 3. | Inadequately Secured Claims | 46.0¢ | 7.0¢ | 30.7¢ | 4.1¢ | 87.8¢ |
| 4. | Banks' Allowed Claims, as adjusted | 28.1¢ | 14.8¢ | 10.4¢ | 8.8¢ | 62.1¢ |
| 5, 6. | Unsecured Claims | 26.5¢ | 22.0¢ | | 13.1¢ | 61.6¢ |
| 7, 8. | Allowed Shareholder Claims, Heck's Shareholders | | | | (e) | (e) |
| 9. | Debtors' Intercompany Claims | | | | | |

(a) Cash distributions represent payments from the Available Cash Pool (Classes 1, 3, 4, 5 and 6) and proceeds of secured assets sold (Classes 2, 3 and 4). Estimated proceeds of assets to be sold under the Plan are based on Spalding/Emig appraisals. The total Available Cash Pool is estimated to be $24 million, as defined in Article XIII, (c)(i)(b) and including estimated proceeds of $4 million which may be recovered from the termination of Heck's Pension Plan, but excluding any net proceeds from Heck's action against ABN.

(b) The Debtors' financial projections indicate their ability to service the principal and interest requirements of the Debentures. Accordingly, the Debentures are reflected at face value. However, Debtors can give no assurance as to the market value of the Debentures.

(c) Promissory Notes issued to holders of secured debt (including Class 4-A) are reflected at their face value.

(d) New Common Stock is reflected at an estimated market value for Reorganized Heck's of $14 million. Such estimate is based entirely on recent market values of Heck's stock. Following Consummation of the Plan, the net book value of the New Common Stock will be considerably greater. However, Debtors can give no assurance as to the market value of the New Common Stock.

(e) Under the Plan, holders of Allowed Claims and Interests in Classes 7 and 8 shall receive an aggregate of 10% of the New Common Stock.

## EXHIBIT B

Article XIII, Paragraph E, Estimated Recoveries Under the Plan From the Debtors' Second Amended Disclosure Statement Filed March 24, 1989

E. Estimated Recoveries Under the Plan.

| | Class | Cash | Promissory Notes | New Common Stock | Total |
|---|---|---|---|---|---|
| | | (a) | (b) | (c) | |
| 1. | Administrative, Priority and Tax Claims | 100.0¢ | | | 100.0¢ |
| 2. | Adequately Secured Claims | 30.0¢ | 70.0¢ | | 100.0¢ |
| 3. | Inadequately Secured Claims | 51.0¢ | 30.2¢ | 4.4¢ | 85.6¢ |
| 4. | Banks' Jointly Secured Claim | 10.3¢ | 7.9¢ | | 18.2¢ |
| 5. | PNB's Judicial Lien Claim | 26.2¢ | —— | 8.1¢ | 34.3¢ |
| 6, 7. | Unsecured Claims, excluding Banks' Unsecured Claim | 22.3¢ | —— | 15.1¢ | 37.4¢ |
| 6, 7 | Banks' Unsecured Claim (d) | 15.1¢ | | 10.2¢ | 25.3¢ |
| 8, 9. | Allowed Shareholder Claims, Heck's Shareholders | | | (e) | (e) |
| 10. | Debtors' Intercompany Claims | —— | —— | —— | —— |

810

(a) Cash distributions represent payments from the Available Cash Pool (Classes 1, 3, 4, 5, 6 and 7) and proceeds of secured assets sold (Classes 2, 3 and 4). Estimated proceeds of assets to be sold under the Plan are based on Spalding/Emig appraisals. The total Available Cash Pool including interest to be earned thereon, is estimated to be $27.6 million, as defined in Article XIII, Section C. If as of the Effective Date the proceeds from the termination of Heck's Pension Plan are not recovered the monies in the Available Cash Pool shall total only approximately $23.7 million. After payment of Allowed Claims in Class 1 estimated at $4.9 million, the payments to be made to Reorganized Heck's and assuming escrowing of $2 million for the Disputed Claims Fund, the Available Cash Pool shall be $15.1 million, excluding proceeds from the termination of Heck's Pension Plan.

(b) Existing debt instruments reinstated to Class 2 creditors and promissory notes issued to holders of secured debt (including Class 4) are reflected at their face value.

(c) New Common Stock is reflected at $15 million. Following Consummation of the Plan, the net book value of the New Common Stock will be considerably greater. However, Debtors can give no assurance as to the market value of the New Common Stock.

(d) Recoveries reflected for Banks' Unsecured Claim in Classes 6 and 7 are the aggregate of the recoveries by the Banks, excluding ABN, expressed as recovery of the total of the Banks' Claims.

(e) Under the Plan, holders of Allowed Claims and Interests in Classes 8 and 9 shall receive an aggregate of 10% of the New Common Stock before issuance of shares of New Common Stock to Hallwood and Warrants to purchase shares of New Common Stock to management, Hallwood and Class 9. Holders of Allowed Interests in Class 9 shall receive shares of New Common Stock together with Warrants to purchase 60,000 shares of New Common Stock which in the aggregate shall constitute 8.8% of the New Common Stock on a fully-diluted basis. No value has been ascribed to the Warrants.

EXHIBIT C

Part of SEC Form 10–Q, Submitted as an Exhibit
To the Debtors' Original Disclosure Statement Filed August 19, 1988
CONDENSED CONSOLIDATED BALANCE SHEETS
(dollar amounts in thousands)
LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY IN ASSETS)

| | May 28, 1988 (Unaudited) | February 27, 1988 * |
|---|---|---|
| Current liabilities: | | |
| Current maturities of long-term debt | $ 67 | $ 67 |
| Current installments of capital lease obligations | 820 | 1,128 |
| Accounts payable, including bank overdrafts of $8,552 at May 28, 1988 | 31,363 | 22,251 |
| Accrued reorganization costs | 4,805 | 4,813 |
| Accrued compensation | 2,399 | 2,177 |
| Accrued and withheld taxes | 2,659 | 1,685 |
| Other | 9,384 | 5,419 |
| Total current liabilities | 51,497 | 37,540 |
| Liabilities deferred pursuant to proceedings under Chapter 11 | 143,797 | 144,951 |
| Other long-term obligations: | | |
| Capital lease obligations | 10,440 | 15,399 |

| | May 28, 1988 | February 27, 1988 |
|---|---|---|
| | (Unaudited) | * |
| Deferred credits and other long-term obligations | $ 2,758 | $ 2,793 |
| | 13,198 | 18,192 |
| Redeemable preferred stock of subsidiary | 3,482 | 3,482 |
| Stockholders' equity (deficiency in assets): | | |
| Preferred stock—no par value, authorized 7,500,000 shares; issued—none | — | — |
| Common stock—par value $.10 per share, authorized 25,-000,000 shares; issued 9,276,062 shares | 928 | 928 |
| Additional paid-in-capital | 19,493 | 19,493 |
| Deficit | (22,030) | (7,661) |
| | (1,609) | 12,760 |
| Less treasury stock of 400,000 shares—at cost | 5,155 | 5,155 |
| Total stockholders' equity (deficiency in assets) | (6,764) | 7,605 |
| Total liabilities and stockholders' equity (deficiency in assets) | $205,210 | $211,770 |

\* Condensed from audited financial statements
See accompanying notes to condensed consolidated financial statements.